Argued October 24, 1977, affirmed in part, reversed in part, and remanded for sentencing March 1, reconsideration denied May 3, petition for review denied September 26, 1978

STATE OF OREGON, *Respondent,*

*v.*

CARL JAMES CALLAGHAN, *Appellant.*

(Nos. 76-3041 to and including 76-3060, CA 7314)

576 P2d 14

Stephanie A. Smythe, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Buttler, Judges.

BUTTLER, J.

**BUTTLER, J.**

Defendant appeals his conviction on 20 counts of theft in the first degree, ORS 164.055,[1] assigning as error: (1) failure of the trial court to suppress as evidence items seized, but not particularly described in the warrant; (2) failure to grant defendant's motion for acquittal; (3) convicting and sentencing defendant on all 20 charges of theft, and (4) placing defendant on probation for five years from the time he has fully served the last of the three consecutive five-year sentences he received.

I

Among the items seized in the search involved herein was a book, the title of which, *Your Check Is In The Mail,* may set the stage for the events described below. Beginning in 1971, defendant organized five corporations: Gregco Industries, on January 27, 1971;

---

[1] ORS 164.055 provides:

"(1) A person commits the crime of theft in the first degree if, by other than extortion, he commits theft as defined in ORS 164.015; and

"(a) The total value of the property in a single or aggregate transaction is $200 or more; or

"(b) The theft is committed during a riot, fire, explosion, catastrophe or other emergency in an area affected thereby; or

"(c) The theft is theft by receiving committed by buying, selling or lending on the security of the property; or

"(d) The subject of the theft is a firearm or explosive; or

"(e) The subject of theft is a livestock animal.

"(2) As used in this section:

"(a) 'Explosive' means a chemical compound, mixture or device that is commonly used or intended for the purpose of producing a chemical reaction resulting in a substantially instantaneous release of gas and heat, including but not limited to dynamite, blasting powder, nitroglycerin, blasting caps and nitrojelly, but excluding fireworks as defined in subsection (1) of ORS 480.110, black powder, smokeless powder, small arms ammunition and small arms ammunition primers.

"(b) 'Firearm' means a weapon, by whatever name known, which is designed to expel a projectile by the action of black powder or smokeless powder and which is readily capable of use as a weapon.

"(c) 'Livestock animal' means a horse, gelding, mare, stallion, colt, mule, ass, jennie, bull, steer, cow, calf, goat, sheep, lamb, pig and hog.

"(3) Theft in the first degree is a Class C felony."

The Go-Out Club, on November 29, 1971; Lee-Jay Stores, Inc.,[2] on July 18, 1974; Golden-West Investment Corporation, on August 12, 1974, and Redlow Corporation on August 25, 1975. For each of the companies formed, defendant was the registered agent. With the exception of The Go-Out Club, defendant and members of his family were the only officers.

Commencing in June, 1975, the Lane County District Attorney's office received several inquiries and complaints concerning Lee-Jay Stores, Inc., from companies claiming to have shipped goods on a "net 30 days" basis to that company, and not receiving payment for the goods shipped. After numerous complaints appeared to create a pattern of conduct, an investigation was undertaken disclosing that: (1) defendant's home address was the mailing address for Lee-Jay Stores, Inc.; (2) fifty-eight companies which had shipped goods to defendant's home address had not been paid, and (3) defendant's attached double-car garage was nearly full to the ceiling of apparently new packaged and unpacked goods.

Continuing the investigation, a police officer responded by telephone to two newspaper advertisements for new merchandise, and was given directions to defendant's house. The officer, using an alias, purchased a new cassette tape recorder from defendant; by contacting the wholesaler, the officer determined that he had paid less than the wholesaler had billed defendant for the item, and that defendant had not paid for the item. While in defendant's home, the officer observed several items, including an electric paper shredder, which he knew had been ordered from a wholesaler who had not been paid therefor. Subsequently, another police investigator contacted defendant in response to another newspaper advertisement. That investigator was invited by defendant to purchase several items, including five pocket calculators, a citizen's band radio and a guitar amplifier, all in new

---

[2]No relation to Lee-Jay, Inc., of Sudbury, Massachusetts.

condition, and all at below wholesale cost. In addition, law enforcement officers found in defendant's trash can numerous torn up and shredded bills from companies attempting to collect money due from defendant.

Based on these facts, a search warrant was issued authorizing the officers to search defendant's house and garage

"* * * for all property listed on the pages attached hereto and incorporated herein * * * and for all records, documents and property of Lee-Jay Stores, Inc., Golden-West Investment Corporation, Redlow Corporation, Gregco Industries, The Go-Out Club, Carl James Callaghan and Patricia Ann Callaghan and other evidence or fruits of the crime of theft."[3]

Attached to the warrant were 58 pages, one for each alleged victim, listing approximately 180 items which had been sent to defendant, his wife, or one of the named corporations.[4]

On February 24, 1976, the warrant was executed over a period of approximately 16 hours in defendant's residence, resulting in the seizure of 543 items. It is the court's denial of defendant's pretrial motion to suppress 360 items seized, but not specifically described in the warrant, which is the foundation for defendant's first assignment of error.[5]

## II

■  Defendant concedes that where the search is conducted pursuant to a warrant, property other than that described in the warrant may be seized where it is evidence of the crime under investigation. *State v. Ronniger*, 7 Or App 447, 492 P2d 298 (1971). He

---

[3] While defendant argues here that the warrant was overbroad, that issue was not raised in the motion to suppress, and will not be considered on this appeal.

[4] The list reads like the index to a mail order catalogue.

[5] Since not all items listed on the search warrant were found it is evident that more than 360 items were at stake, but the record is not clear on this point.

contends, however, that the officers lacked probable cause to believe that the additional items seized were the objects of theft, citing *State v. Sagner,* 12 Or App 459, 506 P2d 510, *rev den* (1973). We disagree.

The scope of the search, while broad, was consistent with, and justified by, the scale of the enterprise, its duration and the number and diversity of items particularly described in the warrant. Defendant's house was an inhabited showroom, his garage a warehouse,[6] and the information the officers had at the time the warrant was issued was sufficient to give them probable cause to so believe. This fact, in itself, distinguishes the instant case from *Sagner,* where we held that the police did not have probable cause to believe that stolen property (other than a camera and strobe light) was at defendant's home. In spite of that fact, however, we held that a television set in plain sight with the serial number obliterated could be seized as obvious evidence of crime. We stated the question as being: "* * * assuming that the items were legitimately encountered, was it evident that they were stolen goods?" 12 Or App at 473.

At the hearing on the motion to suppress, the officer in charge of the search testified that there were, in addition to the search warrant, four methods by which the searching officers determined whether a particular item was to be seized: (1) it bore a label addressed to Lee-Jay Stores, Golden West, Redlow, Gregco, or the Go-Out Club; (2) the addressee's name and address on the label on either the carton or the merchandise itself was torn off or inked out; (3) a phone call to the manufacturer or seller verified shipment of, and nonpayment for, the item; (4) an

---

[6]The evidence indicates that defendant had no storage system, but stacked items in the garage and closets in no discernible order, except that items which he wished to use were where those items might be expected: steaks in the freezer; shoes and clothes in the closet; family crests on the wall; office supplies in drawers and cabinets. A leather jacket, described in the warrant, was seized from defendant's person as he left the house when the officers arrived.

invoice, purchase order or business record found on the premises documented the item seized as having been shipped to one of defendant's companies.[7]

The officers were aware that defendant's operations were conducted on a large scale and were also aware of his *modus operandi.* We conclude that items in plain view of the officers from a place where they had a right to be, when further identified by one or more of the methods used by the officers, could be seized under all of the circumstances here present. The nondescribed boxes and merchandise, coupled with the additional information, fell within the pattern of illegality upon which probable cause was based initially, and upon which the search warrant was issued. There was probable cause to seize the conforming items. *See* ORS 133.585.

■ Defendant also contends that all evidence seized after 10 p.m. should be suppressed because the warrant provided that it was to be executed between 7 a.m. and 10 p.m. on February 24, 1976. The officers served the warrant upon defendant at approximately 8:30 a.m., and did not complete their search until about 16 hours later, or 12:30 a.m. of the next day. The argument appears to be grounded in the semantic distinction between being "served" and being "executed." Defendant argues that the requirement of execution between the specified hours, codified in ORS 133.565(3) as well as appearing in the warrant, means that the search must be completed by the later time, and not just "served" before that time. The state contends, on the other hand, that the purpose of the statutory requirement is revealed in the Commentary

---

[7]From the transcript it appears that there were at least three other methods utilized: an item appeared to be substantially similar to other items seized; an item was shipped to either defendant or his wife; and, in the instance of one bath scale, it was stamped "Eugene Federal Savings." Defendant does not address these items, and it is unclear from the record whether any of them were in fact introduced since defendant stipulated to the introduction of large numbers of items, en mass, without identification in the record.

to the Final Draft and Report of the Oregon Criminal Procedure Code.

"* * * The invasion of private premises in the small hours of the night smacks of totalitarian methods and is more likely to create the terror that precipitates gun battles." Proposed Oregon Criminal Procedure Code 75, Commentary, § 135 (1972).

In this case, the search did not initiate with an "invasion of private premises in the small hours of the night" but was commenced at the civilized hour of 8:30 a.m. The defendant and his family left the house and did not return while the search was in process. We conclude that none of the dangers inherent in night-time searches obtained.

■ First, it is apparent that in the context of the statute the legislature did not intend for "execute" to mean a fully completed search. It is the *initial* shock of officers entering one's house late at night that was sought to be avoided. "Execute," in this instance then, is synonymous with "serve." *See Brothers v. State,* 546 SW2d 715, 717 (Ark 1977). This conclusion is consistent with the use of the word "execute" in ORS 133.555(4) which provides:

"Until the warrant is executed, the proceedings upon application for a search warrant shall be conducted with secrecy appropriate to the circumstances."

It seems clear that once the warrant has been given to the person in control of the premises (ORS 133.575(3)), and the search commenced, there is nothing secret about it, or any need for secrecy with respect to the proceedings.

Second, the analogous requirement of Rule 41(c) of the Federal Rules of Criminal Procedure provides: "The warrant shall be served in the daytime." Construing that provision, the Ninth Circuit Court of Appeals in *United States v. Woodring,* 444 F2d 749, 751 (9th Cir 1971), held that where the search was commenced during daylight, but the search warrant was not actually served until after dark while the

officers were still searching, there was substantial compliance with the rule.

We hold that the trial court properly denied defendant's motion to suppress evidence seized after 10 p.m.

## III

Defendant's second assignment of error is that the court erred in denying his motion for acquittal. The contention is that the state failed to establish the "market value" of the property which was the subject of the theft, ORS 164.115,[8] because the only evidence of value is the invoice price of the goods. Defendant would have us hold that the value is determined by the replacement cost to the wholesaler on which there is no evidence. We decline to so hold.

While no Oregon cases have been found on the point, the New York Court of Appeals in *People v. Irrizari,* 5 NY2d 142, 182 NYS2d 361, 156 NE2d 69, 71 (1959), stated:

"In short, market value * * * denotes *not* the value of the goods in the market in which the owner had purchased them or in which he could replace them, but

---

[8]ORS 164.115 provides:

"For the purposes of chapter 743, Oregon Laws 1971, the value of property shall be ascertained as follows:

"(1) Except as otherwise specified in this section, value means the market value of the property at the time and place of the crime, or if such cannot reasonably be ascertained, the cost of replacement of the property within a reasonable time after the crime.

"(2) Whether or not they have been issued or delivered, certain written instruments, not including those having a readily ascertainable market value, shall be evaluated as follows:

"(a) The value of an instrument constituting an evidence of debt, including, but not limited to, a check, draft or promissory note, shall be considered the amount due or collectible thereon or thereby.

"(b) The value of any other instrument which creates, releases, discharges or otherwise affects any valuable legal right, privilege or obligation shall be considered the greatest amount of economic loss which the owner might reasonably suffer because of the loss of the instrument.

"(3) When the value of property cannot reasonably be ascertained, it shall be presumed to be an amount less than $200."

*See also State v. Albert,* 117 Or 179, 242 P 1116 (1926).

[ 57 ]

the value in the market in which the goods were being traded, namely, the price at which they would probably have been sold in the regular course of business at the time when and place where they were stolen. And so, we note, the courts have held in a number of other jurisdictions where market value is likewise the criterion for determining the value of stolen property. [Citations omitted.]" (Emphasis added.)

*See also State v. Wilson & Wentworth,* 221 Kan 359, 559 P2d 374, 377 (1977); *State v. McDonald,* — Minn —, 251 NW2d 705 (1977).

■■ We agree with the New York Court of Appeals, and hold that where property is stolen from a wholesaler, the price at which the wholesaler offers to sell it ordinarily reflects its market value. The invoice price introduced into evidence was sufficient to establish, prima facie, the market value of the property, which value may be rebutted by defendant. No such rebuttal evidence was introduced, so there was sufficient evidence on which the jury could determine the market value, and the denial of the motion for acquittal was not error.

## IV

Defendant's third assignment of error is that his conviction and sentencing on 20 counts of theft was error because the jury could have found that he did not form the intent permanently to deprive *any* of the merchants until he had received *all* of the merchandise. The trial court gave the following instruction:

"* * * To be guilty of the crime of Theft in the First Degree, the defendant must at the time of obtaining the property have had the intent to deprive the owner of the alleged stolen property."

We assume the jury obeyed the instructions. *Fulton Ins. v. White Motor Corp.,* 261 Or 206, 223, 493 P2d 138 (1972); *Morrill v. Rountree,* 242 Or 320, 326, 408 P2d 932 (1966). Furthermore, the evidence was more than sufficient for the jury to conclude that defendant had the requisite intent each time he ordered and received the merchandise.

■ In any event, the fact that defendant at one time and place withheld property from 20 different victims is sufficient, under *State v. Gilbert,* 281 Or 101, 574 P2d 313 (1978), to constitute 20 separate theft offenses. Although the Supreme Court did not decide whether the defendant in *Gilbert* could be sentenced for each of the offenses there involved, the Court's analysis leads us to conclude that he may be so sentenced.

*State v. Gilbert* began its analysis by noting that

"* * * whether a single act can constitute several offenses depends upon what the legislature intended. *Bell v. United States,* 349 US 81, 75 S Ct 620, 99 L Ed 905 (1955). *State v. Welch,* 264 Or 388, 390, 505 P2d 910 (1973) (multiple punishments) * * *." 281 Or at 106.

The court then focused upon 1973 legislative amendments to the Code of Criminal Procedure, specifically, ORS 131.505(2) and (3):[9]

"The commentary by the Criminal Law Commission to ORS 131.505 is ambiguous on the intent of the section. To understand the import of the comment it is necessary to remember that while *State v. Clark* [46 Or 140, 80 P 101 (1905)] held that stealing the property of several persons, committed at the same time and place, is but one offense, *State v. Gratz,* 254 Or 474, 461 P2d 829 (1969), held: '* * * [I]n crimes against the person when contrasted with crimes against property there are as many offenses as individuals affected.'

"The commentary states:

" 'The effect of this section will be to clarify an apparent conflict between cases that find only one offense when property belonging to several people is stolen versus the situation in which there is a crime

---

[9] ORS 131.505(2) and (3) provides:

"As used in ORS 131.505 to 131.525, unless the context requires otherwise:

"(2) When the same conduct or criminal episode violates two or more statutory provisions, each such violation constitutes a separate and distinct offense.

"(3) When the same conduct or criminal episode, though violating only one statutory provision, results in death, injury, loss or other consequences of two or more victims, and the result is an element of the offense defined, there are as many offenses as there are victims."

against persons and each victim represents a separate offense.'

"At the end of the commentary on this section *State v. Clark, supra* (46 Or 140), and *State v. Gratz, supra,* (254 Or 474), are cited without comment.

"We hold that under ORS 131.505 when one defendant, at the same time and place, withholds the property of two or more victims there are as many offenses as there are victims. * * *" *State v. Gilbert, supra,* 281 Or at 109.

■ It is clear from the foregoing analysis that the legislative intent manifested in ORS 131.505 is to treat crimes against property in the same manner as crimes against persons are treated. To resurrect the distinction in sentencing matters would be contrary to the legislative intent as found by the Supreme Court.

■ This court, applying the rule of *State v. Gratz, supra,* has held that two counts of robbery, arising out of the same transaction, "were separate offenses and the sentencing of the defendant on each of them was proper." *Hussick v. State of Oregon,* 19 Or App 915, 921, 529 P2d 938 (1974), *rev den* (1975). Here, defendant was convicted of 20 separate offenses and sentencing on each was permissible.

This conclusion appears to follow from the statutory definition of "offense." ORS 161.505 provides, in relevant part,

"An offense is conduct for which a sentence to a term of imprisonment or to a fine is provided by any law of this state * * *."

Once we conclude that defendant is guilty of 20 offenses, we have determined that defendant has engaged in 20 acts "for which a sentence to a term of imprisonment or to a fine is provided." If the legislature has provided a term of imprisonment, in this case five years for each of defendant's acts, ORS 164.055(3) and ORS 161.605(3), it is difficult to conclude that the legislature intended for there to be only one sentence.

[ 60 ]

## V

9. Defendant's final assignment of error is that the trial court erred in placing defendant on probation for a period of five years from the time he has fully served the last of the three consecutive sentences he received. Defendant was sentenced to serve three consecutive five-year terms. In addition, he received 15 five-year sentences to run concurrently with the last of the consecutive sentences. Finally, defendant received two five-year concurrent probation sentences. The five-year probation period was to commence after defendant had served the last of the three consecutive five-year sentences. The state having acknowledged that the trial court was without authority to order defendant's probation to begin after defendant has served three consecutive five-year sentences under our opinion in *State v. Maddox,* 29 Or App 787, 564 P2d 1372, *rev den* (1977), construing ORS 137.010, we remand to the trial court for resentencing.

Affirmed in part, reversed in part, and remanded for resentencing.