Argued and submitted September 3, 1997, affirmed April 22, petition for review denied August 4, 1998 (327 Or 448)

STATE OF OREGON,
*Respondent,*

*v.*

STEVEN JAMES PIERCE,
*Appellant.*

(94-05-6636C; CA A91564)

962 P2d 35

Laura Graser argued the cause and filed the brief for appellant.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Wollheim,* Judges.

LANDAU, J.

---

* Wollheim, J., *vice* Leeson, J., resigned.

**LANDAU, J.**

Defendant was convicted of racketeering, ORS 166.720, based on his successful efforts, through letters on his law office letterhead, to induce medical providers to accept reduced payments of their billed charges for services to his client by misrepresenting the amount of insurance settlements that had been negotiated. The conviction was based on predicate charges of theft by deception, ORS 164.085, and issuing a false statement, ORS 165.100. On appeal, defendant's principal contentions are that the state presented insufficient evidence that he obtained anything of value to support convictions for theft by deception and that filing documents containing false information concerning the amount of insurance settlements, as a matter of law, does not constitute issuing a false financial statement. He also contends that, because his actions were taken on behalf of a single client, they cannot form the "pattern" of criminal activity that is required to support a racketeering conviction and that his law office cannot be regarded as an "enterprise" through which the predicate criminal acts were committed. We affirm.

Defendant was an attorney with offices in eastern Oregon and Idaho. He was associated with a firm known first as Pierce & Associates and later as Pierce & Stoddard. During the relevant period of time, there were between one and three attorneys associated with the firm. Defendant mailed business correspondence on firm letterhead, which listed the names of all firm members. The firm members shared telephones and ran large advertisements in the local Yellow Pages listing the associated attorneys, including defendant, under the firm name. The firm had joint general and trust accounts.

Defendant was retained by Jerry Burnette to represent him in a personal injury claim arising from an automobile accident in which Burnette was seriously injured when struck by a car driven by an intoxicated driver. Burnette spent 23 days in the hospital following the accident and accumulated approximately $75,000 in medical bills for services from a number of different providers. The retainer agreement provided that "Pierce & Stoddard" agreed to provide

legal services on a contingency basis and that "should Pierce & Stoddard negotiate or otherwise secure discounts of Client medical expenses, Pierce & Stoddard shall be entitled to retain same as additional fees."

The insurers for the driver and the owner of the car that injured Burnette ultimately settled. One insurer paid $275,000, and another paid $50,000. Defendant signed the settlement letter on behalf of Pierce & Stoddard, and, when he received the payments from the insurers, he deposited the funds in the firm's client trust account.

Defendant then mailed letters on Pierce & Stoddard letterhead to nine medical care providers who had billed Burnette for medical services related to his injuries. The text of each letter was identical and was as follows:

"Our office has been working for a yeara [sic] recovering monies for Jerry Burnett [sic]. We sought to recover punitive damages from the owner of the vehicle for allowing an intoxicated driver to take control of a vehicle. We have recently determined that we did not have sufficient evidence of bad faith on the part of the vehicle owner to establish punitive damages and the vehicle insurance carrier has paid the policy limits of $50,000. Our expenses (not legal fees) are $2,264.66 which includes costs of depositions, investigation, medicals [sic] records, etc. The following constitute Mr. Burnetts [sic] medicals:

| | |
|---|---|
| Dr. Bills | 2,576.75 |
| Dr. Bills | 345.00 |
| Dr. Drake | 175.00 |
| Dr. Phillips | 788.00 |
| Weiser Ambulance | 581.00 |
| Memorial Hospital | 786.95 |
| W. M. Tipton | 808.00 |
| Augustus Tanaka | 1,871.80 |

| | |
|---|---|
| John Jestadt | 103.02 |
| Holy Rosary Hospital | 66,759.78 |
| TOTAL MEDICALS | 74,795.30 |

"Total costs and fees are in the amount of $77,059.96, which is in excess of the $50,000 paid by the insurance carrier covering the vehicle. A copy of the insurance draft is enclosed herein.

"The coverage limits of the vehicle only permit pro-rata payments of medicals after payment of the expenses (no fees).

"We propose the following payments, to be considered payment in full of medical charges to Mr. Burnett [sic] relative to the treatment provided by the medical charges referenced above. An alternative would be tendering the monies to a bankruptcy court, requesting legal fees and then having a lesser distribution than we are providing herein. We are sorry this took so long. A check for your proportionate share is attached to a copy of your bill which is enclosed herein as well."

The letter then proposed a payment schedule under which the providers were to accept 63 percent of their bills as payment in full. That percentage appears to represent the proportional share of the total medical costs that would be covered by the $50,000 insurance policy less costs ($50,000 less $2,264.66 for costs $47,735.34, which is 63.8 percent of the $74,795.30 that Burnette owed). Defendant included checks for 63 percent of the amounts owing with each letter, and each of the providers accepted those checks as payment in full. Defendant then took from Burnette's insurance settlements the amount of the discounts he had obtained on Burnette's medical bills, approximately $27,000, in addition to his contingent fee of $113,750.

Defendant never discussed with Burnette the possibility of filing for bankruptcy. Nor would such a filing have been legitimate, given that Burnette's assets after he received the insurance settlements far exceeded his liabilities. At no time did defendant inform any of Burnette's medical creditors that Burnette had received $275,000 from the

driver's insurance company in addition to the $50,000 mentioned in the letters.

Defendant was indicted for racketeering. The indictment listed nine predicate acts of theft by deception, one of aggravated theft and one of issuing a false financial statement.[1] At trial, the state offered evidence of the foregoing facts. The jury also heard from all of the medical service providers who had accepted the discounted payments on their accounts. All testified that they had agreed to accept the reduced payments solely because they believed, based on defendant's letter, that Burnette had received only $50,000 in insurance payments for the accident. Several testified that they never would have accepted discounted payment had they known of the full amount of the recovery. Following the state's case-in-chief and at the close of the evidence, defendant moved for judgment of acquittal. The trial court allowed the motion as to one charge of theft by deception and the charge of aggravated theft. The jury convicted defendant on the remaining eight counts of theft by deception and one count of issuing a false financial statement.

■ Defendant first contends that the trial court should have granted his motion for judgment of acquittal on all of the predicate charges of theft by deception. Defendant argues that the state failed to prove that, by inducing the medical service providers to compromise their accounts receivable, he took anything of value. According to defendant, the value of property is the price at which it would be sold in the regular course of business; in that regard, he notes that medical service providers routinely discount their accounts receivable. In this case, he contends, "the value of the account receivable was the amount the provider accepted for it." He argues that there is no other evidence in the record of the value of the accounts. He reasons that, because the value of the accounts coincides with what was paid for them, there could have been no theft. The state responds that there is evidence that the providers valued the accounts at something more than what

---

[1] The indictment listed 12 other predicate acts, involving similar conduct on behalf of clients other than Burnette. The trial court granted judgments of acquittal on some of those, and the jury was unable to reach a verdict on the others.

they received for them as a result of defendant's failure to disclose the full amount of the settlements.

■   In reviewing the trial court's denial of the motions for judgment of acquittal, we view the evidence in the light most favorable to the state to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989).

ORS 164.085 provides:

"(1)  A person, who obtains property of another thereby, commits theft by deception when, with intent to defraud, the person:

"(a)   Creates or confirms another's false impression of * * * value * * * which the actor does not believe to be true."

ORS 164.005(5) defines "property" as "any article, substance or thing of value." ORS 164.115(1), in turn, defines "value" to mean "the market value of the property at the time and place of the crime."

■   Viewing the evidence in the light most favorable to the state, we have no difficulty concluding that the trial court did not err in denying defendant's motions for judgment of acquittal. There was evidence that Burnette owed approximately $75,000 in medical bills to various medical service providers. Merely because on some—or even many—occasions providers accept discounted payments, it does not follow that the face amount of the accounts is not evidence of their value. *See, e.g., State v. Callaghan*, 33 Or App 49, 57-58, 576 P2d 14, *rev den* 284 Or 1 (1978) (seller's invoice price is *prima facie* evidence of value). Moreover, there is testimony from the providers that, in this case, they accepted the discounts solely because defendant misrepresented to them the amount of money available from the insurance settlements. Defendant certainly is correct that value means market value—what a willing buyer pays a willing seller. ORS 164.115(1). But the definition presumes that both buyer and seller have accurate information. Value is not, as defendant suggests, what a willing defrauded buyer pays a willing defrauding seller.

■ Defendant next contends that the trial court erred when it failed to grant a motion for judgment of acquittal on the charge of issuing a false financial statement. According to defendant, the statute that defines the elements of the crime was intended to apply only to statements made for the purpose of obtaining credit. Because it is undisputed that he did not supply false information for the purpose of obtaining credit, he concludes, the charge fails as a matter of law. In the alternative, defendant contends that the statute is "is extraordinarily sweeping and too vague to enforce."

ORS 165.100 provides, in part:

"(1) A person commits the crime of issuing a false financial statement if, with intent to defraud, the person:

"(a) Knowingly makes or utters a written statement which purports to describe the financial condition or ability to pay of the person or some other person and which is inaccurate in some material respect."

By its terms, the statute refers to written statements that falsely describe financial condition or ability to pay. The statute imposes no limitation as to the ultimate purpose of the statements, whether it be for obtaining credit or any other purpose. Defendant acknowledges that, but observes that, because the two reported cases applying the statute both involved misrepresentations in loan applications, it is apparent that the statute was intended to reach only that limited purpose.

Defendant is correct that, in *In re Griffith*, 304 Or 575, 622, 748 P2d 86 (1987), and *State v. Wiemals*, 62 Or App 266, 268-70, 660 P2d 702 (1983), the defendants supplied false information in financial statements submitted to obtain loans. Neither opinion, however, suggests that ORS 165.100 should apply *only* to loan applications. Mindful of our obligation "not to insert what has been omitted " when interpreting statutes, ORS 174.010, we decline to read into ORS 165.100 the limitation that defendant proposes.

■ Defendant's contention that, so read, the statute becomes unconstitutionally vague may be disposed of summarily. In *Wiemals*, the defendant argued that ORS 165.100

is unconstitutionally vague "because the business community and general public cannot determine what types of documents are included in the term 'financial statement,'" 62 Or App at 269-70. Defendant in this case makes essentially the same argument. In *Wiemals*, we concluded that the statute was not so unclear as to fail to inform persons of common intelligence of the conduct that is prohibited. *Id.* We find no good reason to reach a different conclusion in this case.

■ Defendant next contends that the trial court erred in denying his motions for judgment of acquittal as to all charges, because the state failed to show the requisite "pattern" of racketeering activity. Defendant reasons that, because all of the predicate acts relate to the mailing of copies of a single letter to creditors of a single client, they constitute a single "isolated incident" and not a pattern of criminal conduct. The state contends that the evidence shows nine separate and independent predicate acts, that is eight separate thefts by deception and one issuance of a false financial statement.

■■ Prosecution under the state's racketeering statute requires proof of a "pattern of racketeering activity," defined as

"engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents, provided that * * * the last of such incidents occurred within five years after a prior incident of racketeering activity."

ORS 166.715(4). The predicate acts need not be temporally continuous. *Computer Concepts, Inc. v. Brandt*, 310 Or 706, 721, 801 P2d 800 (1990). Separate acts that took place within a very short period of time—even a few minutes—are sufficient to establish the requisite "pattern." *See Penuel v. Titan / Value Equities Group, Inc.*, 127 Or App 195, 204-05, 872 P2d 28, *rev den* 319 Or 150 (1994) ("pattern" of racketeering found when "[a]ll of the incidents took place within a very short time, and all of the sales were consummated within a few minutes on the same day").

In this case, viewing the evidence in the light most favorable to the state, defendant sent eight letters to eight different medical service providers with discounted payments in different amounts to each. There were eight different victims and eight separate crimes of theft by deception. Each victim was a medical service provider, the text of the letters was identical in each case, and each of the victims was fraudulently induced to discount its account receivable. Thus, the evidence demonstrated a common intent, result, nexus and method of commission. We conclude that the trial court did not err in concluding that the state had established a "pattern of racketeering activity."

■    Defendant also contends that the trial court erred in failing to grant motions for judgment of acquittal on all charges on the ground that the state had failed to show that defendant had committed the predicate acts through an "enterprise," as that term is defined in the racketeering statute. He contends that the state's theory that his law office constituted an enterprise fails as a matter of law, because the evidence at trial showed that he and his law office were "one and the same" and had no separate existence, as the racketeering statute requires. The state replies that the evidence is sufficient to establish the requisite distinction between the defendant and his law office.

■    The racketeering statute provides that it is unlawful

"for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering or the collection of an unlawful debt."

ORS 166.720(3). "Enterprise" is defined broadly to include:

"any individual, sole proprietorship, partnership, corporation, business trust or other profit or nonprofit legal entity, and includes any union, association or group of individuals associated in fact although not a legal entity, and both illicit and licit enterprises and governmental and nongovernmental entities."

ORS 166.715(2). The statute requires that there be proof of an ongoing entity, however loose, that is distinct from the individual who committed the predicate acts. *State v. Cheek,*

100 Or App 501, 505, 786 P2d 1305, *rev den* 310 Or 121 (1990).

In this case, defendant is correct that there is some evidence in the record that suggests that his law office was not really a formal partnership, that the other lawyers merely shared office space and secretarial assistance, that the other lawyers' names were listed on the letterhead for "no apparent reason," and that they did not really function as business associates with defendants. His argument, however, remains unavailing. Even assuming that the facts as defendant portrays them are insufficient to establish the loose association in fact that the law describes, the fact is that the evidence, *taken in the light most favorable to the state,* shows that the law office did exist as a functioning business entity separate from the acts of defendant individually. Between one and three attorneys shared office space under the auspices of "Pierce & Stoddard" or "Pierce & Associates." Those lawyers sent written communications on firm letterhead, that listed them as members or associates of the firm. The lawyers shared telephones, ran advertisements under the firm name, and maintained joint general and client trust accounts. Defendant's retainer agreement with Burnette stated that the firm—not defendant—would provide legal services, and defendant signed documents—in particular the settlement documents in this case—on behalf of the firm. We conclude that the trial court did not err in concluding that the state had offered evidence sufficient to establish that defendant had committed the predicate acts charged through the enterprise of his law office.

Defendant asserts a number of additional assignments of error. We have considered each of them carefully and reject them without further discussion.

Affirmed.