Submitted July 20, 2011, affirmed April 25, petition for review denied
September 13, 2012 (352 Or 378)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DANIEL A. ONISHCHENKO,
*Defendant-Appellant.*

Washington County Circuit Court
C091937CR; A145065

278 P3d 63

Erin Galli and Chilton & Galli, LLC, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Linda Wicks, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Brewer, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

This is a criminal case in which defendant was convicted, on a guilty plea, of aggravated theft in the first degree, ORS 164.057, for stealing a large number of new shoes from the victim, Savoy, whose retail shoe store had recently gone out of business. On appeal, defendant assigns error to the trial court's imposition of a compensatory fine of $102,413.04, arguing that the amount of the fine is not supported by the evidentiary record. We disagree and, therefore, affirm.

The relevant facts are as follows. After his retail shoe store went out of business, Savoy put his inventory— over 1,500 pairs of new shoes—in a warehouse. He planned to sell the shoes to another retailer. In the meantime, Savoy allowed defendant to sell small quantities of the shoes on an Internet auction site, and he allowed defendant access to the warehouse for that purpose. When Savoy brought a retailer to the warehouse to inspect the shoes as a prospective buyer, Savoy discovered that all of the shoes were gone. Defendant had taken the shoes and had sold them to secondhand stores. Some of the stolen shoes were recovered from the secondhand stores and returned to Savoy, but they had been removed from their original packaging and, as a result, could no longer be sold as new shoes.

The state sought restitution for Savoy, as well as for the secondhand stores from which shoes were recovered. At the restitution hearing, the state presented Savoy's inventory records to establish the value of the shoes. The records showed the wholesale price Savoy had paid for each pair of shoes, as well as the final retail price Savoy had set for each pair before his store went out of business. According to the records, the wholesale prices Savoy had paid for the shoes totaled $106,024.29, and the retail prices he had set for the shoes totaled $175,202.20. Because Savoy was no longer in the retail shoe business, he testified that the wholesale prices of the shoes reflected the value of the shoes at the time they were stolen. That is, he testified that the shoes were worth what he had paid for them.

Savoy testified that, as a general matter, shoes tend to lose value over time, but he did not testify as to how

quickly or how much, nor did he testify that the shoes in his inventory—all of which were less than a year old—had lost value. Instead, he reiterated, "All I have to go by is what I paid for these shoes. We can't argue that [they have] less or more value."

As mentioned, Savoy had a prospective buyer for his inventory. But because defendant stole the shoes before the buyer came to inspect them, the buyer never made an offer for the shoes. Savoy did not testify about how much he expected the offer to be. He did, however, testify that, after his store went out of business, he was "trying to move the shoes in any way possible," which included allowing defendant to sell a few pairs of shoes at a time on the Internet auction site for "anything we could get."

Based on Savoy's testimony and records, the state asked the trial court to order defendant to reimburse the amount Savoy had paid for the shoes. Specifically, the state argued:

> "[T]he crime that took place here resulted in economic damages to Mr. Savoy. Nobody disputes that Mr. Savoy paid $106,000 for those shoes. That's the best indicator of the value of his inventory, $106,000. Perhaps he'd have sold them for 106. * * * Perhaps he would have sold them for 100. Perhaps he would have gotten the deal of his life and sold them for 200,000. That's not the * * * issue for today.

> "The issue for today * * * is that to make Mr. Savoy whole, he requires a restitution amount of $106,000. That was the value of his * * * property at the time it was stolen. That's what he paid for it. And he had every intention of reselling it."

Defendant countered that the court should not use Savoy's purchase price because the shoes had lost value and Savoy would not have been able to sell them for the same amount that he had paid for them:

> "[W]hat we're asking you to impose is the fair market value of the merchandise that was taken. I know it's a hard figure to get to. I think that there's some indication that these shoes did have a value and that they may not have as much value as when they were bought.

"I think that according to Mr. Savoy, over time the value declined. If he was going to get some kind of sale to another company for the retail, it would have been less than what he had paid [for them], I think [that] would be clear just from any kind of business knowledge. There's no way that you're getting back everything—the exact amount that you paid for those."

The trial court agreed with the state and determined that the amount Savoy had paid for the shoes, $106.024.29, reflected the value of the shoes at the time they were stolen. Because some of the shoes were recovered from the second-hand stores, the court determined that Savoy had not lost the full value of all the shoes; the recovered shoes still had some value, even though they could not be sold as new shoes. As the court explained,

"[n]ow, as I understand it, a certain number of shoes were returned. Mr. Savoy says those shoes have no resale value. They obviously have some value. They're shoes. Whether they're donations and you can get a write-off or you can sell them on eBay for ten cents on the dollar, they have some value * * *.

"* * * I don't know what the value of those shoes are other than the amount that the [secondhand stores] said they were worth, and that is what they paid for them.

"And so I am going to deduct that $3,600 from the 106, and my simple math comes to $102,400. I realize there are some pennies that I'm probably not accounting for, but that's a rounded figure."[1]

In response to the court clerk's inquiry as to whether it would "be restitution or compensatory," the trial court answered, "Compensatory fine. It's restitution to the [second-hand] stores and compensatory fine to Mr. Savoy."

On appeal, defendant assigns error to the trial court's imposition of the compensatory fine. As in the trial court, defendant does not dispute that Savoy suffered economic damages; he disputes only the amount of those damages. He asserts that, as a general matter, a court cannot order a defendant to pay a victim a compensatory fine that

---

[1] In the judgment, the court imposed a compensatory fine of $102,413.04.

exceeds the victim's economic damages, and he further asserts that, in this particular case, the compensatory fine that the court ordered him to pay Savoy exceeds Savoy's economic damages. According to defendant, to calculate Savoy's economic damages, the court needed to determine the market value of the shoes at the time they were stolen, and the court erred in doing so because, by relying on the price Savoy had paid for the shoes, it failed to account for both the shoes' depreciation and Savoy's eagerness to sell them. He argues that the market value of the shoes at the time they were stolen

> "would have been significantly less than [the] amount [Savoy had] paid for the shoes. [Savoy] himself testified that * * * shoes lose value over time and that he had been 'trying to move the shoes in any way possible' and for 'anything [he] could get' after the closure of his store."

In response, the state argues that, although a victim must have suffered economic damages in order to receive a compensatory fine, the amount of the victim's economic damages does not limit the amount of the compensatory fine that the victim may receive. In other words, according to the state, a trial court can order a defendant to pay a victim a compensatory fine that exceeds the victim's economic damages. In the state's view, "[o]nce the existence of economic damages [has] been established, [a court is] free to impose a compensatory fine up to the maximum amount allowable for the offense for which defendant was convicted." The statutory maximum fine for defendant's crime of conviction—aggravated theft, a Class B felony—is $250,000. ORS 164.057(2); ORS 161.625(1)(c). Therefore, the state argues, the trial court could have imposed a compensatory fine of up to $250,000, regardless of the amount of Savoy's economic damages. Alternatively, the state argues that, even if the amount of a compensatory fine is limited by the amount of the victim's economic damages, the compensatory fine the trial court imposed did not exceed Savoy's economic damages. According to the state, "there was ample evidence that [Savoy] suffered economic damages—and that those damages were in the amount the court imposed as a compensatory fine."

As explained below, we conclude that there was sufficient evidence for the trial court to find that Savoy's

economic damages were $102,413.04, and therefore, even assuming that those damages limited the amount of the compensatory fine that the trial court could impose, imposition of the $102,413.04 compensatory fine was not error. Accordingly, we do not reach the state's argument that the court could have imposed a compensatory fine in any amount up to the statutory maximum.

We begin our analysis with the relevant statutes. ORS 137.101(1) governs compensatory fines. It provides:

> "Whenever the court imposes a fine as penalty for the commission of a crime resulting in injury for which the person injured by the act constituting the crime has a remedy by civil action, unless the issue of punitive damages has been previously decided in a civil case arising out of the same act and transaction, the court may order that the defendant pay any portion of the fine separately to the clerk of the court as compensatory fines in the case. The clerk shall pay over to the injured victim or victims, as directed in the court's order, moneys paid to the court as compensatory fines under this subsection. This section shall be liberally construed in favor of victims."

Thus, a trial court may order a defendant to pay a compensatory fine to a victim if the defendant's crime resulted in an injury for which the victim has a remedy by civil action.

ORS 137.103(4)(a) defines "victim," as relevant here, as

> "[t]he person against whom the defendant committed the criminal offense, if the court determines that the person has suffered economic damages as a result of the offense."

"Economic damages," in turn, are defined by ORS 137.103(2), which, with exceptions not relevant here, incorporates the definition in ORS 31.710(2)(a). That statute provides:

> " 'Economic damages' means objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services,

recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less."

"In light of those statutes, we have held that the prerequisites for imposition of a compensatory fine are: (1) criminal activities, (2) economic damages, and (3) a causal relationship between the two." *State v. Haines*, 238 Or App 431, 436, 242 P3d 705 (2010) (citing *State v. Donahue*, 165 Or App 143, 146, 995 P2d 1202 (2000)). As mentioned, defendant does not dispute that he engaged in criminal activities that caused Savoy economic damages; he disputes only the amount of the economic damages.

Economic damages are damages that would be "recoverable against the defendant in a civil action." *State v. Barkley*, 315 Or 420, 438, 846 P2d 390, *cert den*, 510 US 837 (1993) (so holding with respect to "pecuniary damages" (now "economic damages"[2])); *State v. Dillon*, 292 Or 172, 182, 637 P2d 602 (1981) (the term "pecuniary damages" encompasses two requirements; the damages "must be special, not general, and they must be damages which could be recovered against the defendant in a civil action arising out of the facts or events constituting defendant's criminal activities").

Savoy would have a civil action for conversion against defendant. *See Mustola v. Toddy*, 253 Or 658, 663, 456 P2d 1004 (1969) ("Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may

---

[2] In 2005, the legislature amended the definition of victim—found at ORS 107.103(4)—for purposes of the compensatory fine statute to refer to a person who suffered "economic damages" as a result of the defendant's offense. Or Laws 2005, ch 564, § 1. Before those amendments, that definition referred to "pecuniary damages," which were defined as:

"all special damages, but not general damages, which a person could recover against the defendant in a civil action arising out of the facts or events constituting the defendant's criminal activities and shall include, but not be limited to, the money equivalent of property taken, destroyed, broken or otherwise harmed, and losses such as medical expenses and costs of psychological treatment or counseling."

ORS 137.103(2) (2003).

justly be required to pay the other the full value of the chattel." (Internal quotation marks omitted.)). "The measure of damages for conversion of personal property is the reasonable market value [of the property] at the time it was taken." *State v. Wise*, 150 Or App 449, 455, 946 P2d 363 (1997); *see also State v. Callaghan*, 33 Or App 49, 58, 576 P2d 14, *rev den*, 284 Or 1 (1978) (in a criminal theft case, the relevant "market value" is "the value in the market in which the goods were being traded, namely, the price at which they probably would have been sold in the regular course of business at the time when and place where they were stolen"). Therefore, to properly calculate Savoy's economic damages, the trial court had to first determine the market value of the shoes at the time that defendant stole them.

The market value of an item can be established through an owner's testimony, "unless it is shown that he has no knowledge of the market value of his property in spite of his ownership." *Lewis v. Worldwide Imports, Inc.*, 238 Or 580, 587, 395 P2d 922 (1964). It can also be established through evidence of the asking price of the item. *Callaghan*, 33 Or App at 58. Evidence regarding the market value of property need not be exact; for example, we have held that evidence that an item of property had a value between $18,000 and $22,000 was sufficient for a trial court to find that the property had a value of $18,000 and to impose restitution in that amount. *State v. Yocum*, 247 Or App 507, 514, 269 P3d 113 (2011).

As described above, the trial court determined that the market value of the shoes at the time defendant stole them was the price that Savoy had paid for them. Defendant argues that the record is insufficient to support that determination.

The market value of property is ultimately a factual matter, and we review a trial court's factual findings to determine whether they are "supported by evidence in the record."[3] ORS 138.222(5)(a). More specifically, when reviewing a

---

[3] To be clear, a trial court's finding of the value of property is a factual matter, resulting from the application of a legal test. Whether a court employed the correct legal test is a question of law, which we review for errors of law. *Barkley*, 315 Or at 438 (the trial court erred in imposing a compensatory fine for the benefit of the

trial court's factual finding regarding the value of stolen property, our task is to determine whether the finding is supported by "any" evidence in the record. *Yocum*, 247 Or App at 514; *see also Helmer v. Transamerica Title Ins. Co.*, 279 Or 457, 464, 569 P2d 10 (1977) (where the trial judge is the trier of fact, "the award of damages must be affirmed if it finds any support in the evidence"); *Eden Gate, Inc. v. D & L Excavating & Trucking, Inc.*, 178 Or App 610, 619, 37 P3d 233 (2002) (reviewing the amount of compensatory damages in a civil case for "any evidence").

Defendant argues that "the state offered no evidence of the actual market value of the shoes." We disagree. The undisputed evidence was that Savoy planned to sell the shoes to another shoe retailer; thus, the trial court could reasonably infer that the shoes were in the wholesale market and that the price Savoy had paid for the shoes when he bought them in that market continued to represent their value in that market. Indeed, Savoy—as the owner of the shoes—testified that the price he had paid for the shoes represented their value. On the record in this case, that testimony alone was sufficient to support the trial court's determination of Savoy's economic damages. *Lewis*, 238 Or at 587.

In arguing that it was error for the trial court to rely on the price that Savoy had paid for the shoes as their market value, defendant emphasizes the fact that Savoy himself testified that, as a general matter, the value of shoes declines over time. But, as mentioned, Savoy did not testify how quickly shoes tend to lose value, nor did he testify that any of the shoes in his inventory had, in fact, lost value. Thus, nothing in the record compels a finding that the shoes defendant stole—all of which were less than a year old—would have declined in value. In other words, Savoy's general testimony that shoes decline in value over time did not preclude the trial court from relying on Savoy's specific testimony that the

---

child-victim's mother where there was no theory of civil liability under which the mother could recover her lost wages from the defendant); *State v. Neese*, 229 Or App 182, 184, 210 P3d 933 (2009), *rev den*, 347 Or 718 (2010) (trial court erred in imposing a compensatory fine in the absence of any evidence of pecuniary loss); *Donahue*, 165 Or App at 146 (trial court erred in imposing a compensatory fine after it expressly found that there was no pecuniary loss). In this case, the parties and court focused on the correct legal test: the market value of the shoes at the time they were stolen. *See Wise*, 150 Or App at 455 (stating that legal test).

price he had paid for the shoes represented their value at the time they were stolen.

Defendant also emphasizes the fact that Savoy was eager to sell the shoes. As we understand it, defendant's argument is that the trial court erred in finding that the market value of the shoes was their wholesale market value, as opposed to their liquidation market value. We reject that argument because the court could find, based on Savoy's testimony, that Savoy intended to reintroduce the shoes into the wholesale market and that the value of the shoes in that market had not changed since he bought them.

In sum, there was evidence in the record to support the trial court's finding that the market value of the stolen shoes was what Savoy had paid for them and, therefore, the court did not err in concluding that Savoy suffered economic damages in that amount (minus the market value of the shoes that were recovered) and imposing a compensatory fine for those economic damages.

Affirmed.