Argued and submitted December 14, 1998, affirmed February 23, 2000

# STATE OF OREGON,
*Respondent,*

*v.*

# WAYNE SCOTT McCOY,
*Appellant.*

(C9703-31981; CA A98783)

998 P2d 709

Daniel J. Casey argued the cause for appellant. With him on the briefs was Garvey, Schubert & Barer.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

DEITS, C. J.

## DEITS, C. J.

Defendant appeals a judgment of conviction for first-degree burglary, ORS 164.225(1). He argues that the trial court erred in admitting evidence of his confession, testimony concerning a coat that he was wearing at the time of the alleged offense, evidence of a knife found on his person at the time of his arrest, and evidence of his prior convictions. We affirm.

Defendant was arrested at a residence in Portland after the police received a call from a neighbor, reporting and describing a suspicious person at that location. When Officer Parker, a uniformed Portland Police Officer, arrived at the scene, he saw defendant standing inside the enclosed front porch of the residence. Steps led up to the porch and a screen door opened onto it. To get to the front door of the residence, it was necessary to go into the enclosed porch area. Parker noted that defendant matched the description given by the neighbor. As defendant walked out of the porch and down the stairs, Parker asked him if he lived there. Defendant replied that he did not. In response to further questions from Parker, defendant told Parker his name and date of birth. Defendant said that he was in the area collecting bottles and cans.

A few minutes after Parker arrived, Officer Steenson came to the residence. Steenson noticed that a pane of glass, directly over the deadbolt lock, in the front door of the residence was broken. Steenson

> "looked inside to see if [he] could tell whether or not the window was actually a recent break as far as glass being on the inside as well as the outside of the door. [He] noticed several, several small textured-type of pieces of glass that were on the inside of the house as well as a larger pane was lying down on the ground."

Later, Parker reached through the broken window pane and found that he could reach the inside of the deadbolt lock. He determined that it was a double cylinder dead bolt.

During the initial conversation with Parker and Steenson, defendant showed the officers two screwdrivers that he told them he had found on the street. He asked if he could keep the screwdrivers. Parker took possession of them.

Steenson then stayed with defendant in the fenced yard of the residence while Parker went to talk to the neighbor who had made the call to the police. Steenson asked defendant if he had broken the window and defendant said that he had not. Steenson told defendant that "it's time now that we told the truth," and said "sometimes accidents do happen." He then asked defendant if he had accidentally broken the window. Defendant said that he had. While they were waiting for Parker, defendant asked if he could leave. Steenson told him that he could not leave and asked him to sit down.

About 20 minutes after he first arrived, Parker requested that detectives report to the scene. When the detectives arrived, they asked if defendant had been informed of his *Miranda* rights. Parker told them that he had not. Detective Mitchell then walked over to defendant and advised him of his *Miranda* rights while Detective Sinnott was talking to Steenson. After talking with Steenson, Sinnott spoke with defendant, who told Sinnott that he had inadvertently broken the window when he was knocking on the door and that it was a mistake. Sinnott then asked defendant if he had reached through the window and tried to unlock the door. When defendant said that he had not, Sinnott told him that they may have witnesses; namely, people across the street whom they hadn't interviewed yet. He also pointed out to defendant that there were a couple of tears in the sleeve of defendant's coat that looked as though they had been made by reaching through the broken window. Defendant then admitted that "he had reached in the window and he had tried to unlock the door, but * * * he was unable to because it was a double cylinder dead bolt." He said that he had only intended to take any cans and bottles that might be lying around in the house. Defendant then went back to the front door with Sinnott and showed him how he had accidently broken the window and reached in to try to unlock the door. At that time, Sinnott arrested defendant and again advised him of his *Miranda* rights. After arresting defendant, Sinnott asked him if he was willing to talk about everything again and defendant said that he was. Defendant then repeated the same story that he had previously told to Sinnott. During a search incident to the arrest, the officers found a fillet knife in defendant's inside coat pocket.

Before trial, defendant moved to suppress testimony about the coat that he was wearing at the time of his arrest and the statements that he had made to both Steenson and Sinnott. During trial, defendant moved to exclude the knife found in his pocket at the time of his arrest and evidence of his prior convictions. The trial court granted the pretrial motion with respect to the statements that defendant had made to Steenson. The court explained that that evidence should be suppressed based on the court's determination that defendant was in custody at the time that he spoke to Steenson, but that he had not yet received the required *Miranda* warnings. The trial court denied the motion to exclude defendant's subsequent confession to Sinnott on the ground that it followed a valid *Miranda* warning and was not coerced "by the prior statements because the prior statements [were] not sufficiently incriminatory to push somebody into making the further statements[.]" The trial court later denied the motions to suppress the knife and coat, and also allowed in evidence of defendant's prior convictions, concluding that all were admissible under Ballot Measure 40 or Senate Bill 936 (1997). Senate Bill 936 is an omnibus bill that made numerous changes to Oregon's criminal procedure statutes. The bill was intended to codify certain constitutional policy choices embodied in Ballot Measure 40, adopted by the people at the 1996 general election and placed in the Oregon Constitution as Article I, section 42. *See generally State v. Fugate*, 154 Or App 643, 649-51, 963 P2d 686, *modified* 156 Or App 609, 969 P2d 395 (1998), *rev allowed* 328 Or 275 (1999) (outlining history and purpose of SB 936).

■ ■ Defendant first assigns error to the trial court's admission of his confession to Sinnott. He contends that, under *Oregon v. Elstad*, 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985),[1] because the first confession to Steenson was obtained in violation of *Miranda*, his later confession to

---

[1] Defendant's argument on this issue relies solely on *Oregon v. Elstad*, 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985). He refers to state law only with respect to situations in which the first unwarned confession is coerced making the subsequent warned confession inadmissible absent a "sufficient break." *See State v. Guayante*, 63 Or App 212, 663 P2d 784 (1983); *State v. Elstad*, 61 Or App 673, 658 P2d 552 (1983), *rev'd sub nom Oregon v. Elstad*, 470 US 298 (1985), and *State v. Hibdon*, 57 Or App 509, 645 P2d 580 (1982). Because we find no coercion here, we do not address those cases.

Sinnott was tainted by that illegality and, consequently, also was inadmissible. A prior unwarned confession, however, does not automatically render inadmissible a subsequent confession obtained after proper *Miranda* warnings are given. *Elstad,* 470 US at 318. If the unwarned confession was obtained using deliberately coercive or improper tactics calculated to break the suspect's will, then the subsequent confession is not admissible unless there is a break in the events sufficient to prevent the coercion from carrying over from the earlier confession. *See id.* at 310. However, the court will not presume a "coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary." *Id.* at 318. In such circumstances, the relevant inquiry is whether the second statement also was voluntary.

■ The parties do not dispute that defendant's first confession to Steenson was properly suppressed. "When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Id.* at 317. Defendant argues, however, that his first confession was obtained by the use of "deliberately improper tactics and circumstances calculated to undermine [his] will." Specifically, he contends that "Steenson took advantage of what he perceived to be defendant's 'mental deficiencies,' asking the same questions over and over, and using scare tactics and trickery in an attempt to wear down his will." It is defendant's position that the second confession was inadmissible, because his initial confession was coerced and there was no break in the events to prevent the coercion from carrying over to his second confession, even though defendant was advised of his *Miranda* rights before the second confession.

We conclude, however, as did the trial court, that defendant's initial confession to Steenson was voluntary. "A statement was made voluntarily if, under the totality of the circumstances, it is apparent that 'defendant's will was not overborne and his capacity for self-determination was not critically impaired.' " *State v. Goree,* 151 Or App 621, 631, 950 P2d 919 (1997), *rev den* 327 Or 123 (1998) (citing *State v. Vu,* 307 Or 419, 424-25, 770 P2d 577 (1989)).

In arguing that his confession to Steenson was involuntary, defendant relies on the fact that the officers perceived that he had mental deficiencies. He asserts that Steenson took advantage of those perceived deficiencies by repeatedly asking him if he had broken the window, accusing him of lying, and tricking him into admitting that he had broken the window by suggesting that it could have been an accident. Steenson did testify that, during his approximately 15-minute conversation with defendant, he asked more than once what defendant was doing at the house and whether he had broken the window. Further, it is true that defendant finally admitted breaking the window when Steenson told him that it was time to tell the truth and then asked defendant if he had, perhaps, accidently broken it. However, none of those actions was improperly coercive. Steenson was the only officer with defendant when this conversation took place, and he described the encounter as "very low key" and "completely just conversational." There is no indication that defendant's statements were induced by threats or promises intimating that he would receive favorable treatment if he cooperated or by any implied or direct threats of force.

Further, the record does not support the contention that defendant had any mental deficiencies that interfered with his ability to exercise his free will in these circumstances. Although both Parker and Steenson expressed concern about defendant's mental capabilities, there is no evidence that defendant actually had any mental deficiencies that made him incapable of making a voluntary statement to the police. In fact, the evidence shows that defendant communicated with the officers in a coherent and responsive manner. He even discussed with Steenson the differences between a burglary and a robbery. Although defendant was agitated and upset when Mitchell, and then Sinnot, advised him of his *Miranda* rights, nothing about his agitated state demonstrated that he was incapable of understanding what was happening. As the trial court found:

"There is a question about retardation in this case, but the answers that the defendant did, in fact, give were responsive and appropriate and I don't find that the state has—that we have a situation where his mental state is

such that he is incapable [of] waiving his rights or understanding what's going on based on the statements we have."

We conclude that defendant's will was not overborne at the time of his confession to Steenson and that his capacity for self-determination was not impaired. Accordingly, we conclude that his confession to Steenson was voluntary.

Because we have concluded that defendant's first confession was voluntary, the critical question in deciding if defendant's later confession to Sinnott should have been admitted is whether it was knowingly and voluntarily made. *Elstad*, 470 US at 318. However, the only basis that defendant asserts for concluding that his second confession was involuntary is that it was tainted by his earlier confession. Accordingly, we conclude that defendant's later confession to Sinnott was voluntary.

Defendant argues alternatively that his confession to Sinnott was inadmissible because, after he was given *Miranda* warnings, he did not knowingly and voluntarily waive his constitutional right to counsel or to remain silent. The analysis is the same for a waiver of these constitutional rights as it is for the voluntariness of a confession. *State v. Foster*, 288 Or 649, 655, 607 P2d 173 (1980). "[W]e must inquire into the totality of the circumstances surrounding the * * * police interrogations to determine whether the defendant in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel." *Id*. The state has the burden of showing a knowing, intelligent, and voluntary waiver. Defendant contends that the state did not carry that burden here. We disagree.

It is undisputed that defendant was informed of his constitutional rights. Further, as the trial court found, although defendant was confused at first, when he was advised of his rights by Mitchell, he eventually told Mitchell that he understood them. In addition, following the advice of rights, defendant chose to discuss the matter with the officers. Defendant contends that "the mere fact that [he] answered the detective's questions after being warned" does not establish a valid waiver. However, "[a]n express waiver of rights is not required as a matter of law under either the Oregon or federal constitutions." *State ex rel Juv. Dept. v.*

*Cook,* 138 Or App 401, 404, 909 P2d 202 (1996), *aff'd on other grounds* 325 Or 1, 932 P2d 547 (1997). "Rather, we determine whether [defendant] made a knowing, voluntary and intelligent waiver of his rights based on the totality of the circumstances existing at the time the waiver was made." *Cook,* 138 Or App at 405. As discussed above, the evidence does not establish that defendant's will was overborne or that his capacity for self-determination was impaired. We conclude that defendant's waiver of his constitutional rights was valid and that the trial court did not err in admitting his confession to Sinnott.

■     Defendant's second assignment of error is that the trial court erred in denying his motion to exclude any testimony concerning the coat that he was wearing at the time of his arrest. He contends on appeal that, because the state failed to preserve the coat as evidence, his statutory and constitutional rights to discovery were violated. Defendant relies on ORS 135.805 to ORS 135.873 in arguing that his statutory discovery rights were violated. However, defendant did not make this statutory argument at trial. Defendant acknowledges that this specific argument was not made but asserts that the trial court interrupted counsel and prevented her from making the statutory argument. Although the court did interrupt counsel during the colloquy concerning the coat, counsel had an opportunity to make additional arguments. Under ORAP 5.45(2) we will not consider a matter on appeal "unless it was preserved in the lower court[.]" Consequently, we will not consider defendant's statutory argument.

■■     The argument that defendant did preserve and now argues on appeal is that, by failing to preserve his coat as evidence, the state violated his due process right to preservation of potentially exculpatory evidence under *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963). In *Brady,* the Court held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees a criminal defendant access to evidence in the state's possession that "is material either to guilt or to punishment[.]" 373 US at 87. In *State v. Zinsli,* 156 Or App 245, 252, 966 P2d 1200, *rev den* 328 Or 194 (1998), we articulated what a defendant must show to support a claim that the

state's failure to preserve evidence constitutes a denial of due process:

> "the defendant must make some showing that either the state acted in bad faith in failing to preserve the evidence or that the evidence sought to be discovered will be favorable. Where the state has not acted in bad faith, the defendant must show that the claim of favorableness is genuine, not speculation, and that comparable evidence cannot be obtained 'by other reasonably available means.' " (Citations omitted.)

Here, there was no showing that the state acted in bad faith. Defendant argues that Sinnott's failure to seize and preserve the coat because he felt "it was not necessary" requires an inference of bad faith. We do not agree. The record shows that the officers allowed defendant to continue wearing the coat after his arrest and that it was still in his possession when he was transported to the detention facility. There is simply no evidence to support the conclusion that, in allowing defendant to keep his coat, the officers acted in bad faith.

In the absence of bad faith, in order to prove a due process violation, defendant must show that his "claim of favorableness is genuine." Defendant contends that the presence of the coat "would have supported his theory that he never put his arm through the window." His argument is based on the theoretical possibility that the coat was not torn or that it had no glass particles on it. That possibility, however, is completely speculative. In addition, the testimony that was admitted with respect to the coat was not definite and was not particularly material to defendant's guilt or innocence. The officers testified that the coat was "pretty beat up" with other rips and punctures and Sinnott testified that he was only "guessing" that there were glass particles on the sleeve. Defendant failed to show that his claim of favorableness was genuine. The trial court did not err in admitting this evidence.

■ Defendant's third assignment of error is that the trial court should not have admitted evidence of the knife found in his coat pocket at the time of his arrest. The trial court explicitly stated that it found the knife admissible only under Ballot Measure 40 or Senate Bill 936 and that if the balancing

test required by OEC 403 were applied, instead, then the knife would *not* be admissible. Ballot Measure 40 has been declared unconstitutional by the Oregon Supreme Court, *Armatta v. Kitzhaber,* 327 Or 250, 959 P2d 49 (1998), and, as the state acknowledges, Senate Bill 936 does not eliminate the requirements of OEC 403. Accordingly, the trial court erred in admitting the evidence on that basis.

■　The state argues alternatively, however, that "[a]ny error in admitting evidence of the knife found on defendant would have been harmless." We agree. Evidentiary error does not require that a conviction be reversed if there is "little likelihood that the error affected the verdict." *See, e.g., State v. Larson,* 325 Or 15, 27, 933 P2d 958 (1997); *State v. Busby,* 315 Or 292, 299, 844 P2d 897 (1993). Defendant argues that the improper admission of the knife creates a likelihood that the verdict was affected. However, in view of the other evidence presented to the jury, we do not believe that it was likely that the admission of evidence of the knife affected the verdict. The only testimony about the knife was that it was found in defendant's coat pocket when he was arrested. We conclude that its admission was harmless error.

■　Defendant's final assignment of error is that evidence of defendant's prior convictions should not have been admitted. Defendant argues that, in considering the admissibility of this evidence, the trial court should have applied the balancing test required by OEC 403 and that it erred when it instead relied on Ballot Measure 40 and Senate Bill 936 and allowed the evidence of defendant's prior convictions to be admitted. As discussed above, the trial court did err in admitting the evidence *on that basis.*

The state argues, however, that that evidence was admissible without relying on Ballot Measure 40 or Senate Bill 936. In so contending, the state renews the argument that it made to the trial court. Specifically, the state contends that evidence of defendant's prior convictions was admissible for impeachment purposes under OEC 806. OEC 806 provides, in pertinent part:

"When a hearsay statement * * * has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would

be admissible for those purposes if the declarant had testified as a witness."

At trial, defendant's mother was questioned about defendant's actions on the morning of his arrest. When asked if defendant left her house that morning she said, "Yes, he did. He got up and ate breakfast, then—and *he said he was going to go look for bottles* and he grabbed a large dark green or black bag." (Emphasis added.) The state asserts, relying on *State v. Dishman,* 148 Or App 404, 407-08, 939 P2d 1172 (1997), that the prior convictions could be admitted to show that, contrary to the testimony of his mother, defendant did intend to commit a crime.

In *Dishman,* this court quoted Kirkpatrick's explanation of the effect of OEC 806:

"Rule 806 creates a potential trap for a defense attorney who introduces out-of-court statements of the defendant in a case where the defendant does not take the stand. By introducing the defendant's earlier statements, the defendant becomes subject to impeachment under Rule 806 and defendant's prior criminal convictions may be received, to the extent they are admissible for impeachment under Rule 609." 148 Or App at 408 (quoting Laird C. Kirkpatrick, *Oregon Evidence*, 631 (3d ed 1996)).

OEC 609 provides, in pertinent part:

"For the purposes of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record, but only if the crime (a) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted * * *."[2]

Our holding in *Dishman* is directly controlling here. In *Dishman,* the defendant introduced his own hearsay statements, that were supportive of his defense, through another witness. The state was then permitted to impeach

---

[2] The Oregon Supreme Court has held that "[i]n the context of evidence presented pursuant to OEC 609, * * * balancing [under OEC 403] is impermissible." *State v. King,* 307 Or 332, 337, 768 P2d 391 (1989).

those hearsay statements through evidence of the defendant's prior convictions. Here, as in *Dishman*, because defendant's out of court statements were introduced "in an effort to establish that defendant did not intend to commit [a crime,] introduction of defendant's prior felony convictions was a valid method of impeaching the credibility of those statements." 148 Or App at 408. We conclude that the trial court did not err in admitting evidence of defendant's prior convictions.

Affirmed.