Argued and submitted March 8, McMinnville High School, McMinnville, affirmed in part; reversed in part and remanded October 31, 2001

In the Matter of
Ray Martin Deford, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF WASHINGTON COUNTY,
*Respondent,*

*v.*

RAY MARTIN DEFORD,
*Appellant.*

J96-0379; A99706

34 P3d 673

——————

David E. Groom, Public Defender, argued the cause for appellant. With him on the brief was Jennifer Harrington.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

## LINDER, J.

Youth appeals from a juvenile court judgment finding him within the jurisdiction of the court for acts that, if committed by an adult, would constitute first-degree arson, felony murder, and criminally negligent homicide. Youth, who was 11 years old at the time of the incident, confessed to starting a fire in which eight people died. We write to address only two assignments of error. First, youth challenges the admissibility of his inculpatory statements to police, arguing that his statements and his *Miranda* waiver were involuntary. Second, youth challenges the denial of his motion to dismiss, arguing that the state failed to demonstrate that he burned property of "value," as required to prove the charges of first-degree arson and felony murder. For the reasons that follow, we affirm in part, reverse in part, and remand for entry of an amended order of commitment.

## I. BACKGROUND

Eight residents of the Oakwood Park Apartment complex in Aloha died on June 28, 1996, when an early morning fire destroyed a portion of the complex. Fire investigators determined that the fire originated in the stairwell near the laundry room and that it was intentionally set using some type of accelerant.

Based on several contacts with youth, officers began to suspect that youth started the fire. Youth was first interviewed by Detective O'Connell on the morning after the fire, as part of the initial investigation into the fire's cause. Youth said that the smell of smoke woke him, and he escaped. Youth told O'Connell that he believed that the fire was intentionally set, that whoever started the fire had probably destroyed any evidence, and that the person may have used rubbing alcohol or lighter fluid.

O'Connell interviewed youth again the next day, while youth sat in the back seat of an unmarked police car. At the outset of the interview, O'Connell explained to youth that they were just there to "chat" and emphasized that youth was not under arrest and that he could leave at any time. O'Connell did not give youth *Miranda* warnings at that time.

During that interview, youth reiterated his earlier description of the night of the fire and continued to present various theories about the fire's cause. Specifically, youth told O'Connell that he thought the fire was started by some "kids" who lived in the apartment complex. Youth again speculated that whoever started the fire could have used any number of flammable materials, including car oil, kitchen oil, and rubbing alcohol. O'Connell and youth engaged in a short colloquy during which O'Connell asked youth whether it would be "better" for whoever started the fire to confess. Youth told O'Connell that it would be "better" for the person to admit starting the fire "because they wouldn't get in a lot of trouble if they admit it, but if they don't admit it they're gonna get in a lot of trouble." Youth then expressed that he was bored with the questions, and he asked to leave. O'Connell asked youth if they could talk again later, youth agreed, and the interview ended.

The next day, Deputy Fire Marshal Kellas responded to a fire alarm at the hotel in which youth and his parents were staying. The hotel manager reported that youth had pulled the fire alarm, and Kellas interviewed youth about the incident. Youth told Kellas that he had accidentally triggered the alarm. Kellas asked youth about the apartment complex fire. Youth told Kellas that someone had set two fires in the stairwell of the complex using rubbing alcohol.

Police searched youth's apartment that same day. Among the items found were a burned portion of a sheet from youth's bed, two lighters, rubbing alcohol, and a squirt gun containing a liquid that smelled like alcohol.

The next morning, O'Connell and Officer Garrett located youth in his grandmother's apartment and obtained the permission of youth's mother to question him in the apartment manager's office. In a prior discussion, youth had disclosed to O'Connell that his favorite television show was "Cops" and that he watched it almost every night. O'Connell began by asking youth if he had ever seen the officers on "Cops" advise people of their *Miranda* rights. Youth indicated that he had and that he "sort of" knew what they were. O'Connell then advised youth of his rights by reading each of the four *Miranda* rights, one at a time, stopping after each

one and asking youth to define it. Youth explained that the right to remain silent meant that he did not have to talk. O'Connell asked youth to explain the meaning of the statement: "Anything you say can and will be used against you in a court of law." Youth described it to mean that "you could be judged." When O'Connell stated: "You have a right to talk to a lawyer and to have him or her present with you while you are being questioned," youth explained that a lawyer is someone who knows the law. Finally, O'Connell read the fourth right "If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish." Youth said that it meant that, "if you cannot afford a lawyer, you get one." Youth indicated that he understood each of those rights. O'Connell asked youth to read a written statement listing the *Miranda* rights and to sign it. Youth read it out loud and had trouble reading some of the words. Youth signed the form, after which O'Connell asked youth if they could continue to talk, and youth agreed.

O'Connell continued where they had left off in the prior interview by asking youth whether he felt that it would be "worse" if someone had started the fire on purpose or if it were an accident. O'Connell described the extent of the investigation and reminded youth that the fire department, the police, and the ATF had expended a tremendous amount of resources to investigate the fire. He then told youth that he believed that youth had started the fire.

Youth initially responded by denying any involvement in the fire. Eventually, however, youth made several inculpatory statements. When O'Connell asked youth who should be responsible for telling his parents, youth said, "I'll tell them." O'Connell asked youth if he meant to hurt anybody, and youth replied, "No." Youth complained that he was hungry and that he had a headache. They ordered pizza.

While they were waiting for the pizza to arrive, O'Connell asked youth if he used matches or a lighter to set the fire. Youth replied, "Why don't you just guess?" O'Connell declined to do so. Youth then went into what O'Connell described as a "false whimpering stage," during which he made strange noises. Several minutes later, he "suddenly and instantly" snapped out of it and said, "Okay, I'll level

with you." Youth explained that he could not use a lighter or a match because they were too noisy. Youth offered to describe the fire if O'Connell promised to keep it secret. O'Connell explained that he could not make that promise. Youth asked if he would be allowed to leave if he answered three questions. O'Connell told youth that he could not leave because he already had implicated himself.

Youth eventually began to "loosen up a bit" and related that he had started the fire as an "experiment." He explained that he used matches that he had found in the stairwell of the apartment complex, took a one-half- to three-quarter-inch stack of newspapers from the laundry room, placed them in the middle of the carpet near the door to his apartment, placed a match on the newspapers, lit another match, and placed it on top of the first match. Youth denied using any type of fuel in starting the fire. He explained that the fire quickly grew out of control and that, after trying but failing to extinguish it, he went back to his apartment, lay down on the living room floor, and hoped that the wind eventually would blow the fire out. Instead, it grew. Within a few minutes, the smell of smoke began to penetrate the apartment, and youth woke his parents.

When youth finished describing those events, O'Connell acknowledged that it must have been difficult for youth to talk about the incident and told youth that he would do his best to help him. Youth replied, "You are already helping me as best you can." That portion of the interview lasted less than an hour. Youth did not, at any time, specifically state that he did not want to talk to O'Connell.

O'Connell next asked youth if he would give a recorded statement. Youth agreed. O'Connell began recording the interview at that point and read the *Miranda* warnings again. Youth proceeded again to describe how he had started the fire. Several minutes into the recorded statement, O'Connell asked youth what he (O'Connell) was forgetting to ask, and youth replied, "Nothing. We're done." O'Connell then said, "No. Sit down. We're not done. It's not that simple, son. What else happened that night? Anything else?" The interview continued for several more minutes.[1]

---

[1] As we later explain, the trial court suppressed all of youth's statements after youth said, "We're done."

O'Connell informed youth that he would be taken into custody, at which point youth asked to speak to his father. When his father confronted him, youth initially denied starting the fire, but he eventually confessed again. Youth was transported to the sheriff's office where he confessed a fourth time, revealing that he had used rubbing alcohol to accelerate the fire and that he had started the fire by placing the newspapers on top of a pie plate.

The state filed a 17-count petition alleging juvenile court jurisdiction over youth based on acts that, if committed by an adult, would constitute first-degree arson, felony murder, and criminally negligent homicide.

## II. THE ADMISSIBILITY OF YOUTH'S STATEMENTS TO POLICE

Youth filed a pretrial motion to suppress his statements to police. He relied on two grounds. First, he argued that, due to his impaired capacity, his statements were not voluntary as required by both the state and federal protections against coerced confessions. Second, he asserted that he did not knowingly and voluntarily waive his *Miranda* rights.

In support of his motion, youth offered medical evidence of his limited cognitive capacity. More specifically, over the course of a four-day hearing, youth presented medical evidence that he has the cognitive capacity of a seven-year-old child, lacks the ability to engage in abstract thought and reasoning, has considerable difficulty reading, and has an intelligence quotient (IQ) that hovers in the "borderline functioning" range. According to youth's evidence, his verbal scores are generally higher than his performance skills, which at times fall within the "mildly mentally retarded" range. Two of youth's experts testified specifically about youth's ability to understand *Miranda* warnings. Dr. Konkol believed that youth could recognize "aspects of meaning or some parts" of the significance of the *Miranda* warnings but he would have difficulty drawing inferences or implications from the warnings. Youth's other expert, Dr. Bolstad, described youth as having a good "verbal memory" that at times makes him appear to understand what he is saying when, in fact, he does not. Bolstad concluded that youth apparently had memorized the *Miranda* warnings and their

definitions but lacked an appreciation of the adversarial nature of the interviews and of the potential for or consequences of self-incrimination. Bolstad explained that youth's practical understanding of the *Miranda* warnings was limited and that he did not understand that those rights applied in the particular context in which he confessed. As Bolstad put it, youth did not understand that he could have an attorney with him "right then and right there."

In response to youth's evidence, the state presented the testimony of several officers at the hearing, including O'Connell, who discussed youth's prior police contacts and his fascination with the television show "Cops." The state also presented expert witnesses who testified as to youth's cognitive ability. Dr. Sabastian clarified that, although youth has always been identified as learning disabled, he has never been identified as mentally retarded. She agreed that youth "would never understand reading *Miranda* rights," but she believed that if the rights were read to him, youth would be able to comprehend their meaning. The state also presented testimony from Dr. Hulteng that youth had the cognitive capacity to understand *Miranda* warnings. In examining youth, Hulteng asked him why he had agreed to talk to O'Connell. Youth explained, "When he read me my rights, that made me nervous. I was probably going to get arrested. He didn't even ask me if I wanted a lawyer." That statement, along with others, indicated to Hulteng that youth understood both the *Miranda* warnings and the fact that his relationship with O'Connell was adversarial. Hulteng's testimony, however, was somewhat equivocal about when that understanding developed—*i.e.*, whether youth understood the warnings and the adversarial nature of the relationship when he confessed or whether he developed that understanding at some later point, after being arrested. Hulteng stated that youth's understanding of *Miranda* "was a pretty clear one with the interview that I did," but then he stated that "any inference about the past is less certain."

■ The juvenile court granted youth's motion to suppress as to all statements that youth made in response to police questioning after the point at which youth said, "We're done." As to all statements before that point, the trial court denied the motion. On appeal, youth assigns error to the

juvenile court's partial denial of his motion, renewing the arguments he made below that, under both the Oregon Constitution and the United States Constitution, all of his statements were involuntary and that his *Miranda* waiver was invalid. Because this is a juvenile proceeding, we review the facts *de novo*, including the facts at issue on the motion to suppress. *State ex rel Juv. Dept. v. Gallegos*, 150 Or App 344, 347, 945 P2d 656 (1997). We first consider whether youth's statements were voluntary. We then turn to the validity of youth's waiver of his *Miranda* rights.

## A. *Voluntariness of Youth's Statements*

Relying on both Article I, section 12, of the Oregon Constitution, and the Fourteenth Amendment to the United States Constitution, youth argues that his statements to police are inadmissible because his age and limited cognitive ability, standing alone, rendered them involuntary. In response, the state argues that both the state and federal guarantees against involuntary confessions protect against incriminating statements elicited through police coercion or similar governmental overreaching. According to the state, the personal characteristics of someone questioned by police are not enough, in and of themselves, to render a confession "involuntary" for purposes of the constitutional guarantees on which youth relies. Here, youth does not contend that the police engaged in overreaching or otherwise conducted themselves inappropriately, nor does the record suggest that they did. Thus, youth's challenge to his statements as "involuntary" hinges on whether voluntariness is an inquiry directed to the mental state and capacity of the accused, or one directed to the governmental forces brought to bear on that mental state.

Ordinarily, we would address that issue under the Oregon Constitution before considering youth's challenge under the parallel federal provision. *State v. Charboneau*, 323 Or 38, 53, 913 P2d 308 (1996) (stating principle). But we instead begin with youth's federal claim. We do so because the United States Supreme Court's decision in *Colorado v. Connelly*, 479 US 157, 166, 170, 107 S Ct 515, 93 L Ed 2d 473

(1986), is squarely on point and readily resolves youth's federal claim. In contrast, youth's claim under the Oregon Constitution requires more extensive analysis, as we explain below.

In *Connelly*, the defendant approached a police officer and, without prompting, confessed to murder. The officer immediately advised the defendant of his *Miranda* rights, which the defendant waived. The officer then began to question the defendant. The defendant revealed that he had been a patient in several mental hospitals, stated that he wanted to talk to the officer "because his conscience had been bothering him," and then described details of the crime. At trial, the defendant moved to suppress his statements to police, asserting that he suffered from chronic schizophrenia and that his condition interfered with his ability to make free and rational choices.

The Court held that the defendant's statements were admissible, notwithstanding the defendant's claim that his free will and his ability to appreciate the consequences of making the statements were impaired by his mental condition. After reviewing its prior voluntariness jurisprudence, the Court concluded that overreaching is a "crucial" element of the Fifth Amendment voluntariness analysis.[2] *See id.* at 163 n 1 (citing numerous cases involving police misconduct). Said another way, the federal constitutional guarantee against "compelled testimony" is a safeguard against police coercion, not a guarantee that secures broader notions of free choice and free will. *Id.* at 163-64, 170. Thus, under the federal analysis, some form of police overreaching or coercion is a necessary predicate to a claim that a statement is involuntary; the individual characteristics of a person questioned by police cannot, without more, "ever dispose of the inquiry into Constitutional 'voluntariness.'" *Id.* at 165.

---

[2] For a discussion of the origins of the due process voluntariness analysis, see *Dickerson v. United States*, 530 US 428, 120 S Ct 2326, 147 L Ed 2d 405 (2000). *See also Brown v. Mississippi*, 297 US 278, 286, 56 S Ct 461, 80 L Ed 682 (1936) (relying on the Due Process Clause to exclude a confession procured through torture, finding that the police actions were "revolting to the sense of justice").

■	What constitutes police overreaching sufficient to invalidate a statement under the federal analysis cannot be readily quantified. The amount of pressure that police constitutionally may exert varies with the "totality of circumstances" surrounding a statement; the factors to be considered as a part of that totality include a suspect's age, education, and intelligence. In rare instances, police misconduct may be so extreme that it renders a suspect's confession involuntary without any examination of the suspect's age, education, intelligence, and like factors. *See Brown*, 297 US at 286. But the converse is not true. That is, the personal characteristics and circumstances of the suspect, even when extreme, as a matter of law cannot alone render statements involuntary. *See Connelly*, 479 US at 164-66. Personal circumstances that may make a suspect less able to resist coercion are legally relevant only if police, in fact, exert coercion. The conduct of the police therefore necessarily is the starting point of the analysis.

■	Under the federal standard for involuntariness, youth's challenge to the admissibility of his statements fails. Youth does not argue on appeal, nor did he argue below, that O'Connell's conduct involved anything that can be characterized as police overreaching or coercion. Nor, on *de novo* review, do we find any evidence of coercive conduct. To the contrary, O'Connell modified his behavior to accommodate youth's age, experience, and capacity. The interviews were relatively short and took place in a nonthreatening atmosphere. O'Connell was dressed in civilian clothing during the interviews, and he did not make any express or implied threats or promises of leniency nor in any other way compel youth against his will to discuss the events in question. In short, there simply is no police overreaching of any kind or degree in this case. Because there is not, the trial court correctly rejected youth's federal involuntariness challenge.

	We turn to youth's argument under Article I, section 12, of the Oregon Constitution. As the parties' arguments reflect, an extensive body of case law exists in which both Oregon appellate courts have analyzed "voluntariness" claims under Article I, section 12. Those precedents, however, do not explicitly identify the role of police overreaching

in the analysis as a legal matter.[3] This case presents us with the opportunity to do so.

In past cases, neither our court nor the Supreme Court has approached the analysis of Article I, section 12, using the constitutional methodology of *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).[4] Under *Priest,* a court determines the meaning of a constitutional provision by analyzing the text of the constitutional provision, the historical circumstances that led to its creation, and the case law surrounding it. 314 Or at 415-16. An examination of those sources of interpretation here sheds useful light on the principle embodied in Article I, section 12.

■ Text is especially instructive. The relevant guarantee is contained in a single sentence in Article I, section 12, which declares: "No person shall * * * be compelled in any criminal prosecution to testify against himself."[5] The key word is "compelled" and the pivotal issue is the meaning that attaches to that term in particular. When the constitution was drafted and adopted, "compelled" was generally understood to mean:

> "1. To drive or urge with force, or irresistibly; to constrain; to oblige; to necessitate, either by physical or moral force; as, circumstances *compel* us to practice economy.

[3] The state argues that, in *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991), the Oregon Supreme Court "suggest[s]" that the Oregon Constitution's protection against involuntary confessions is limited to circumstances involving coercion. In *Stevens*, the court examined the *Connelly* Court's adoption of the preponderance-of-evidence standard for voluntariness. In the course of that examination, the court acknowledged that the federal test requires police coercion. Although the state does not rely on *Stevens* as resolving the issue, even the limited reliance it places on that case is too much. *Stevens* simply does not signal the court's leaning on the issue, one way or the other.

[4] *See Smothers v. Gresham Transfer, Inc.,* 332 Or 83, 90-91, 23 P3d 333 (2001) (noting similar posture with regard to Article I, section 10).

[5] The parties' respective arguments proceed on the assumption that the protection afforded by that provision to "criminal prosecutions" extends to juvenile delinquency proceedings. The Oregon Supreme Court's decision in *State ex rel Juv. Dept. v. Reynolds*, 317 Or 560, 857 P2d 842 (1993), however, potentially calls that assumption into question. In *Reynolds*, the court held that juvenile delinquency proceedings are not criminal prosecutions for purposes of the protections afforded by Article I, section 11, of the Oregon Constitution. Whether the same conclusion might follow under Article I, section 12, has not been raised or briefed, and the answer to it is not obvious and beyond dispute. Consequently, we note the issue without expressing any view on its resolution.

"* * * * *

"2. To force; to take by force or violence; to seize."

*See* Noah Webster, *An American Dictionary of the English Language*, 235 (1851) (defining "compel"). That common understanding of the word's meaning was consistent with its legal meaning. One of the leading legal dictionaries of the day defined the derivative word "compulsion" to mean: "[t]he forcible inducement to do an act. *Coercion* [.]" John Bouvier, *A Law Dictionary Adapted to the Constitution and Laws of the United States of America*, 200 (1839) (emphasis in original). Those definitions are not burdened by nuance. They unambiguously contemplate overreaching in the form of force, constraint, coercion, or inducement. Moreover, because Article I, section 12, is fundamentally a guarantee against state action, the "force, constraint, coercion, or inducement" necessarily must derive from the conduct of a state actor.[6] Simply put, as a matter of plain text, the constitutional protection against "compelled testimony" protects the accused from being coerced by the government to confess.

■ With regard to the second of the *Priest* inquiries— *i.e.*, the historical circumstances that led to the creation of Article I, section 12—little direct legislative history surrounds the adoption of Article I, section 12. That section, like most of the Oregon Constitution's Bill of Rights, was borrowed from the 1851 Indiana Constitution; it generated little or no reported discussion at Oregon's constitutional convention. *See generally* Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857*, 28, 310 (1926). We are not limited to an examination of that legislative history, however. When a constitutional provision is rooted in English and American common-law traditions, those traditions are part of the historical circumstances that we may consider as well. *See State v. Fugate*, 332 Or 195, 210-15, 26 P3d 802 (2001) (examining

---

[6] Article I, section 12, like the other sections of the Oregon Constitution's Bill of Rights, protects citizens from state action. *See, e.g., State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000) (noting that "Article I, section 9, prohibits only state action that infringes on a citizen's constitutional rights"). *See generally State v. Smith*, 301 Or 681, 702-14, 725 P2d 894 (1986) (Linde, J., dissenting) (the "Constitution *forbids the state* to prosecute upon 'compelled' statements of the defendant") (emphasis added).

historical circumstances, including United States Supreme Court precedent, as relevant to interpretation of Oregon's Ex Post Facto clause); *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 94-108, 23 P3d 333 (2001) (examining historical circumstances in interpreting Article I, section 10's, Remedy Clause).

We need not examine the relevant sources describing the historical foundation of the protection against compelled testimony at length, because the Oregon Supreme Court has already done so. In *State v. Fish*, 321 Or 48, 54-56, 893 P2d 1023 (1995), the court considered whether field sobriety tests are "testimonial" in nature and therefore within the scope of Article I, section 12. *Id.* at 54-56. In resolving that issue, the court broadly examined the nature of the protection that Article I, section 12, was designed to afford criminal defendants. The court's articulation of the central principle that animates the guarantee is particularly apt here:

> "Although the historical basis of the right against compelled self-incrimination has been subject to varying interpretations, it is clear that the right originated and continued to develop as a *protection against inquisitorial methods of investigation* and prosecution."

*Id.* at 55 (emphasis added; citations omitted). History thus underscores what Article I, section 12, by its terms expressly provides: The guarantee against compelled testimony is a protection against governmental overreaching.

Finally, as *Priest* prescribes, we consider the case law surrounding Article I, section 12. 314 Or at 417. Although no case has explicitly held that police overreaching is necessary to trigger the protection of that clause, the cases are uniformly consistent with that conclusion.

The earliest Oregon cases suppressing confessions as involuntary had a common law rather than a constitutional source. At common law, the rule was that a confession should be excluded in criminal prosecutions if it was "obtained by the influence of hope or fear applied by a third person to the prisoner's mind." *State v. Moran*, 15 Or 262, 265, 14 P 419 (1887); *see also State v. Wintzingerode*, 9 Or

153, 161-62 (1881) (earliest articulation of the rule in Oregon cases). Almost as early on, however, the Oregon Supreme Court recognized that Article I, section 12, embodied the same principle with its guarantee that no person shall be compelled in any criminal prosecution to testify against himself. *State v. Andrews*, 35 Or 388, 391-92, 58 P 765 (1899).[7] Consistently with that recognition, cases decided under Article I, section 12, have required that "neither duress nor intimidation, hope nor inducement caused [the] defendant to" confess. *State v. Spanos*, 66 Or 118, 120, 134 P 6 (1913); *see also State v. Ely*, 237 Or 329, 332, 390 P2d 348 (1964) (same); *State v. Nunn*, 212 Or 546, 553, 321 P2d 356 (1958) (same). As the Oregon Supreme Court has declared, the extensive body of jurisprudence under Article I, section 12, establishes that

> "the key to the 'free and voluntary' character of the confession is in the inducement made to the defendant—was there any promise or threat made to the defendant which would elicit a false confession[.]"

*State v. Smith*, 301 Or 681, 693, 725 P2d 894 (1986). Thus, both the constitutional protection against involuntary confessions and the common-law principle that it embodies fundamentally are protections against overreaching on the part of government officials (*e.g.*, the police).

The fact-specific resolution of the past cases underscores the crucial role of official coercion in the analysis. Threats, promises, inducements, and similar overreaching consistently have led to suppression of resulting statements and confessions. *See, e.g., State v. Mendacino*, 288 Or 231, 233, 603 P2d 1376 (1979) (confession excluded where, despite denials of culpability and requests for attorney, officers relentlessly questioned defendant).[8] Conversely, however,

---

[7] The court's analysis of the nature and scope of the protection against compelled confessions has continued to recognize that the constitutional guarantee is anchored in the traditional common-law rule against use of induced confessions. *See, e.g., State v. Smith*, 301 Or 681, 696-97, 725 P2d 894 (1986); *State v. Mendacino*, 288 Or 231, 236, 603 P2d 1376 (1979).

[8] *See also Ely*, 237 Or at 334-35 (confession excluded where school officials promised teacher that he would not be prosecuted if he confessed); *State v. Linn*, 179 Or 499, 513, 173 P2d 305 (1946) (confession excluded where police threatened that if defendant "did it 'the hard way,' they would fight him to the last inch," combined with further threat of harsh sentence for refusing to confess); *State v.*

when police have not engaged in coercive tactics of any kind, challenges to the "voluntariness" of a defendant's confession or other statements consistently have failed.[9] Youth cites no Oregon case, and our research has disclosed none, in which an accused's statement or confession has been rendered involuntary solely due to an accused's internal pressures or personal cognitive limitations that may have contributed to his or her decision to speak to authorities.

To the contrary, several cases decided under Article I, section 12, point in the opposite direction. Illustrative among them is *State v. Burks*, 107 Or App 588, 813 P2d 1071, *rev den* 312 Or 151 (1991) and *State v. Vu*, 307 Or 419, 424-25, 770 P2d 577 (1989), both of which involved voluntariness challenges under Article I, section 12, that are particularly analogous to youth's challenge in this case. The defendant in *Burks* predicated her challenge to the voluntariness of her statements on her youth, her personal mental state, and the internal forces that caused her to confess to murder. We described her argument as

"essentially that the circumstances of her life and those attendant on the interviews made her statements involuntary. Specifically, she contends that she was 15 years old, had had a 'horrendous childhood,' had lived on the street for three years, was a prostitute, was addicted to drugs, was injured and in pain, was still under the influence of the medication given her at the hospital, was isolated from her father and had confessed because she thought she was 'supposed to.' "

---

*Cochran,* 72 Or App 499, 696 P2d 1114 (1985) (confession excluded based on police trickery in convincing defendant that they had evidence that they in fact did not have; decided on federal grounds); *State v. Capwell,* 64 Or App 710, 716, 669 P2d 808 (1983) (confession excluded where police told defendant that if he confessed he would receive treatment rather than be prosecuted).

[9] *See State v. McCoy,* 165 Or App 499, 505, 998 P2d 709, *rev den* 331 Or 193 (2000) (officer's "very low key" and "conversational" encounter refuted claim of involuntariness; no evidence that confession was induced "by threats or promises intimating that defendant would receive favorable treatment if he cooperated or by any implied or direct threats of force"); *State v. Harmon,* 77 Or App 705, 714 P2d 271, *rev den* 301 Or 240 (1986) (defendant's statements were not involuntary simply because police did not advise defendant that he was a suspect; police questioning of defendant was noncoercive and was in the presence of defendant's attorney); *State v. Williams,* 64 Or App 448, 668 P2d 1236, *rev den* 296 Or 120 (1983) (confession was voluntary where deputies were careful not to make promises to defendant).

*Burks*, 107 Or App at 591-92. We rejected her voluntariness challenge, observing that she did not argue that police "acted improperly or made threats or promises to her." *Id.* at 591.

The defendant in *Vu* likewise made no claim that the investigating officer had elicited his statement through improper threats or promises. Instead, the defendant, who had immigrated from Vietnam about seven years before the crime, relied on cultural disparities and his poor ability to speak and understand English as rendering his statements involuntary. *Vu*, 307 Or at 424. The Supreme Court rejected his challenge, concluding that the record established that the defendant's statements were the product of an "essentially free and unconstrained choice" rather than "made under the influence of fear produced by threats or of promises or intimation of favor." *Id.* at 424-25. The court emphasized:

> "[D]efendant offers no basis for the claim that the statement was involuntary other than simply claiming cultural differences and lack of English language skills. Defendant does not contend that the cultural differences coerced him into making the false statement or that he misunderstood the question because of his poor language skills. * * * Whatever the cultural disparities and alleged deficits in the English language, defendant's statement was not involuntary."

*Id.* at 425. In short, *Burks* and *Vu*, and other analogous Oregon cases decided under Article I, section 12, focus distinctly on the presence of police coercion or other overreaching and have declined to declare an accused's statement or confession involuntary based solely on the accused's mental condition, internal motivation, or other personal circumstance.[10]

---

[10] Other cases similarly rejecting involuntariness challenges based only on an accused's cognitive abilities or internal psychological pressures include: *State v. Davis*, 98 Or App 752, 780 P2d 807 (1989), *rev den* 309 Or 333 (1990) (trial court's reliance on defendant's "dull normal" intelligence level was misplaced); *State v. Hickan*, 71 Or App 471, 477, 692 P2d 672 (1984) (court concluded that defendant's statements were voluntary and rejected his argument that, "because he is mentally retarded, his will to resist was overcome by the mere fact of questioning itself"); *State v. Smith*, 7 Or App 485, 492 P2d 317 (1971) (confession of 17-year-old was voluntary despite near-illiteracy and "borderline intelligence between retardation and low average"); *see also State v. Keiper*, 8 Or App 354, 359, 493 P2d 750, *rev den* (1972) (suggesting that linking coercion with a defendant's internal psychological pressures would "not only greatly extend the existing legal concepts of improper

■ Viewing the constitution's protection against compelled testimony through the interpretative lens of *Priest*—*i.e.*, plain text, historical circumstances, and relevant case law—leads to a single conclusion. Article I, section 12's, guarantee that no person shall be compelled in any criminal prosecution to testify against himself is directed distinctly at governmental coercion or similar overreaching. As a result, we now make explicit what for over a decade has been implicit in the analysis and approach of the cases decided under Article I, section 12: police overreaching is an essential predicate of a challenge to the admissibility of a statement or a confession as involuntary.

■ Thus, the state constitutional involuntariness analysis parallels the federal analysis. The amount of pressure that police constitutionally may exert will vary with the "totality of circumstances" surrounding a statement; the factors to be considered as a part of that totality include a suspect's age, education, and intelligence. *See generally State v. Davis*, 98 Or App 752, 780 P2d 807 (1989), *rev den* 309 Or 333 (1990). But a suspect's personal characteristics and circumstances as a matter of law cannot alone render statements involuntary. Rather, such circumstances are relevant only if police, in fact, exert coercion and only insofar as those circumstances render a suspect less able to resist that coercion. As is true of the federal analysis, the conduct of the police therefore necessarily is the starting point of the analysis of whether a confession is involuntary under Article I, section 12. Here, as already discussed, youth does not argue that police conducted themselves inappropriately in any fashion; the record refutes any suggestion that they did. Consequently, youth's challenge under Article I, section 12, fails.

B. *Miranda Waiver*

■ Our conclusion that youth's confession was voluntary does not end our inquiry regarding the *Miranda* waiver. A waiver not only must be "voluntary in the sense that it was the product of a free and deliberate choice," it must also be "made with full awareness both of the nature of the right being abandoned and the consequences of the decision to

---

coercion, but as a practical matter would abort the use of statements or confessions given to the police by a defendant in virtually every criminal case").

abandon it." *Colorado v. Spring*, 479 US 564, 573, 107 S Ct 851, 93 L Ed 2d 954 (1987) (citing *Fare v. Michael C.*, 442 US 707, 725, 99 S Ct 2650, 61 L Ed 2d 197 (1979). The "knowing and intelligent" prong of the waiver analysis tests whether, under the totality of the circumstances, the defendant "knew that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* at 574. The inquiry necessarily focuses primarily on the defendant's state of mind, rather than on police conduct, and overreaching is not required to find that a waiver was not "knowing and intelligent." In juvenile cases, we consider, among other circumstances, the juvenile's age, experience, education, background, and intelligence and whether the juvenile has the competency to understand the *Miranda* warnings and the consequences of waiving them. *Fare*, 442 US at 725; *see also State ex rel Juv. Dept. v. Cook*, 138 Or App 401, 405, 909 P2d 202 (1996), *aff'd* 325 Or 1, 932 P2d 547 (1997) (similarly noting circumstances to be considered in determining validity of waiver under the Oregon Constitution).

■ Youth argues that his age and diminished capacity render a "knowing and intelligent" waiver unlikely if not impossible. In examining the circumstances surrounding youth's confession, we have carefully reviewed O'Connell's testimony describing each interview with youth, youth's taped statements to police, and the detailed expert testimony regarding youth's cognitive capabilities and his ability to understand the *Miranda* warnings and to appreciate the adversarial nature of the investigation. The trial court found—and we agree—that, under the totality of the circumstances, youth had a sufficient understanding of the *Miranda* warnings and the implications of waiving his rights. We find the following circumstances particularly relevant: O'Connell slowly and carefully read the *Miranda* warnings to youth, stopping after each one, and asking youth to define them. Youth was able to repeat each warning and to give appropriate definitions. Youth admitted that, when O'Connell read the warnings, "I kind of figured out I was going to get arrested. The cops don't read you your rights for no reasons." When asked how he knew he would be arrested, youth said that he was familiar with the scenario from watching "Cops."

Youth also had prior contacts with police. *See Cook,* 138 Or App at 405 (considering a 14-year-old youth's prior police contacts in determining that he validly waived *Miranda* rights). Although the mental health and medical experts could not agree on the precise degree to which youth was able to grasp the *Miranda* concepts, all of the experts did agree that youth had the cognitive capacity to understand the warnings; their differences of opinion in that regard were ones of degree.

Accordingly, we conclude that the trial court correctly suppressed only those statements made after youth attempted to assert his right to be silent. Youth's statements made prior to that point were admissible because they were voluntary and because youth validly waived his *Miranda* rights.

### III. SUFFICIENCY OF EVIDENCE: FIRST-DEGREE ARSON

We turn to the question of whether the evidence adequately supports the trial court's finding that youth committed acts that, if committed by an adult, would constitute the crimes of first-degree arson and felony murder. The adequacy of the evidence on both offenses turns on whether the state's proof of first-degree arson sufficed, because the felony murder charge depends on youth's commission of acts that would constitute that underlying offense.

ORS 164.325 provides, in relevant part, that a person commits first-degree arson:

"(1) * * * [I]f, by starting a fire or causing an explosion, the person intentionally damages:

"* * * * *

"(b) Any *property*, whether the property of the person or the property of another person, and such act recklessly places another person in danger of physical injury or protected property of another in danger of damage[.]"

(Emphasis added.) Significantly, the state did not allege that the property that youth intended to burn was the apartment building. The petition instead alleged that youth intentionally damaged "certain property, to wit: *newspapers*" and that, by starting that fire, youth "recklessly" placed "protected

property, to wit: a dwelling * * * in danger o[f] damage."
(Emphasis added.) The petition also alleged eight counts of
felony murder, relying on the first-degree arson charge as the
underlying felony.

As emphasized above, the first-degree arson statute
applies only when the person intentionally damages "prop-
erty." Property is defined by ORS 164.005(5) as "any article,
substance or thing *of value*, including, but not limited to,
money, tangible and intangible personal property, real prop-
erty, choses-in-action, evidence of debt or of contract."
(Emphasis added.) The measure of "value" is described in
ORS 164.115:

"For the purposes of chapter 743, Oregon Laws 1971,
the value of property shall be ascertained as follows:

"(1) * * * [V]alue means the *market value of the prop-
erty at the time and place of the crime*, or if such cannot
reasonably be ascertained, the cost of replacement of the
property within a reasonable time after the crime."[11]

(Emphasis added.)

The state's theory of the case was that the small
stack of newspapers burned by youth was property because it
had "recycling value." The particular newspapers burned by
youth were issues of *This Week*, a free publication of *The
Oregonian*. Copies of that publication were delivered weekly
to the apartment building and usually were placed in the
laundry room for the residents. The bulk of the publication
consisted of advertisements and coupons. At trial, the apart-
ment manager testified that she cleaned the laundry room
regularly, at which time she would remove any leftover edi-
tions and place them in a recycling bin. The recycling bins
eventually were emptied by Aloha Garbage Disposal (Aloha),
which would in turn deliver the recycled paper to Far West

---

[11] The statute bears the title, "Value of stolen property." But that title is a mis-
nomer. By its express terms, the statute unambiguously applies to all of "chapter
743, Oregon Laws 1971," which encompasses the entire 1971 criminal code, which
includes ORS chapter 163. The title is not part of the statute and is of no legal sig-
nificance. ORS 174.540; *Exchange Properties, Inc. v. Crook County*, 164 Or App
517, 520, 992 P2d 486 (1999).

Fibers, Inc. (Far West), a large-scale paper recycling company that purchases paper, sorts and bundles it, and resells it to "repulp mills."

Far West derives its business from garbage services, including Aloha, and from various organizations and other members of the public. When a seller delivers a truckload of paper to Far West, the truck is weighed, emptied, then weighed again to determine the weight of the load itself. If an individual comes into the business with a smaller amount of paper, the Far West staff uses a smaller scale. That scale is kept inside the office and weighs paper in one-half pound increments.

Richard Paul, Far West's business manager, testified at trial that, at the time this incident occurred, he was purchasing newspaper for one penny per pound. Because a daily edition of a newspaper weighs approximately one pound, that makes each newspaper worth approximately one penny. On direct examination, the state showed Paul a stack of approximately a half dozen *This Week* papers—which was substantially more than youth burned[12]—and asked:

"[State:] And if I were to walk into your business, sight unseen, without an appointment, and say, 'Mr. Paul, here's my newspapers. What will you give me for them?,' what process would you undertake?

"[Paul:] Initially I'd try to encourage you to donate this amount to me, because it's almost more hassle than anything else. If you insisted, I would send you back to the small scale. I would send an employee with you, who would then weigh them, * * * and we would then, out of our petty cash fund, pay you the value of that."

Paul said that he would pay a minimum of five cents, because he does not generally keep pennies in the petty cash fund. If a child came in with a small amount, however, he would probably give the child a quarter, "to encourage young people to be in the resource conservation mode." On cross-examination, Paul conceded that he would not be willing to go to

---

[12] Youth described the newspapers he burned as a one-half to three-quarter inch stack. The exhibit is a stack of newspapers at least three inches thick. The comparison suggests that youth burned approximately two editions of the newspaper.

someone else's house to purchase a small quantity of newspaper because he is not in the business of collecting or hauling paper. He noted, additionally, that he is aware of other paper recycling companies that impose 40- or 50-pound minimum purchase requirements. He also acknowledged that he is sometimes willing to pay people for paper, even if it is not profitable, and that his willingness to purchase in small quantities reflects his desire to "promote the conservation effort."

At the close of the state's case, youth moved for a dismissal[13] on the charges of arson and felony murder, arguing that the state did not demonstrate that the newspapers were property because it did not prove that they had "value." The state responded that the newspapers had "recycling value" and that the coupons in the papers also had value. The trial court agreed with the state and, consequently, denied youth's motion. Youth assigns error to that ruling. Although our factual review is *de novo*, the question presented on appeal is—at least as a threshold matter—one of law: did the state's evidence as to the newspapers' "recycling value" satisfy the statutory definition of "property." We conclude that it did not.

The Supreme Court's decision in *State v. Whitley*, 295 Or 455, 457-59, 666 P2d 1340 (1983), provides significant guidance. In *Whitley*, the issue was whether the state had presented any evidence that a piece of rag constitutes "property" under the arson statutes. The defendant, in protest, had thrown a burning rag onto the stage at a public meeting on the campus of the University of Oregon. In construing ORS 164.325(1)(b), the same provision at issue in this case, the court in *Whitley* observed that the legislature had based Oregon's first-degree arson statute on the Model Penal Code (MPC), with one significant deviation: Oregon's version requires that the defendant intentionally damage "property" by starting a fire. The parallel provision in the MPC requires only that a person "starts a fire." MPC § 220.1(2). With

---

[13] To be precise, youth moved for a judgment of acquittal. But as we have done in other cases, we treat the motion as a motion for dismissal, which is the correct procedural device to test the sufficiency of evidence in a juvenile proceeding. *See State ex rel Juv. Dept. v. Smith*, 126 Or App 646, 648, 651, 870 P2d 240 (1994) (treating motion for acquittal in delinquency proceeding as motion to dismiss and reviewing juvenile court's ruling *de novo*).

respect to the "property" element in Oregon's arson statute, the court said:

"By injecting the necessity that the state prove that what was burned was 'property,' the state is bound by the definition of 'property' found in ORS 164.005(5). This means that as an element of proof the state must prove the property had 'value[.]' "

*Whitley*, 295 Or at 458-59. The court concluded that, because the state in *Whitley* had not presented evidence of the rag's "value," the state had failed to meet its burden of proof. *Id.* at 460; *see also Hurst v. Employment Division*, 81 Or App 367, 370, 724 P2d 946 (1986) (reversing Employment Appeals Board order because the order lacked a finding that "two discarded cookies" were a substance or thing of value subject to theft).

As the court did in *Whitley*, we rely on statutory definitions to guide our interpretation here. "Value" is defined as the "market value * * * at the time and place of the crime." ORS 164.115(1). Although "market value" is not further defined by the statute, we have observed that, for purposes of that statute, the term has its ordinary meaning: what a willing buyer will pay a willing seller. *State v. Pierce*, 153 Or App 569, 575, 962 P2d 35, *rev den* 327 Or 448 (1998) (so concluding with respect to ORS 164.115(1)'s reference to term "market value"). *See generally Webster's Third New Int'l Dictionary*, 1383 (unabridged ed 1993) (defining "market value" as "a price at which both buyers and sellers are willing to do business: the market or current price").

■■ Thus, "market value" is value of a particular kind. Fundamentally, for an item to have market value, there must be a market for the item in which willing buyers and sellers engage in arm's-length transactions in which the item is traded for value. *See generally Campbell v. Karb*, 303 Or 592, 740 P2d 750 (1987) (evidence of price fixed by two parties dealing at arm's length is generally readily accepted as establishing fair market value); *PGE v. Taber*, 146 Or App 735, 740, 934 P2d 538, *rev den* 325 Or 438 (1997) (where there is no market for a item, it cannot have market value). If there is no established market for an item, its market value—if any—becomes speculative. *Erickson Hardwood Co. v. North Pacific*

*Lumber*, 70 Or App 557, 568, 690 P2d 1071 (1984), *rev den* 298 Or 705 (1985). Speculative worth, however, is not enough; "value," for purposes of the relevant definition of property, cannot be established in the abstract or by theoretical supposition. *See, e.g., State v. King*, 118 Or App 4, 7, 846 P2d 412 (1993) (evidence that scrap metal value "varies" is not sufficient to prove market value for purposes of the statutory "property" definition).

Here, the state put on evidence that the newspapers that youth burned could have been redeemed at Paul's recycling facility for somewhere between five and twenty-five cents, depending on the age of the seller. The state relies on that testimony to supply the necessary proof of market value that was lacking in *Whitley*. In doing so, the state implicitly assumes that, because Paul is a willing purchaser of small quantities of paper, such quantities have a "market value." As we explain below, however, the notion of market value requires the existence of *both* a willing buyer and a willing seller to demonstrate that there is an actual market in which the good has value in trade. In this case, the state never established that willing sellers of such small amounts of newspapers exist.

Recall the evidence. Paul testified that other paper recycling companies in the Portland metropolitan area impose minimum purchase requirements of 40 or 50 pounds. In his individual case, he might be willing to purchase a small quantity of newspaper *if* someone were to bring him such an amount. Before purchasing it, he would first encourage any person in that situation to donate the paper because, to him, "it's almost more hassle than anything else." His willingness to purchase small quantities of newspaper is not motivated by his business or economic interests but by his desire "to promote the conservation effort." Paul, moreover, acknowledged that he would not purchase such a small quantity off-site, and thus he would not be willing to go to the apartment complex, collect the newspapers from the apartment complex's laundry room, and pay anyone for them. As a result, any payment he would make for a quantity of newspaper as small as that burned by youth would depend on someone bringing the newspaper to him.

That evidence, rather than suggesting a true recycling "market" for such small quantities of newspaper, tends to establish the opposite. According to the state's evidence, recycling businesses generally pay only for much larger quantities of newspaper; they are not willing to deal in small quantities such as the amount burned by youth in this case. The situation is thus analogous to that in *Ward v. Dept. of Revenue*, 293 Or 506, 650 P2d 923 (1982). There, the Supreme Court declined to use the value of a large piece of property as a basis for establishing the value of smaller parcels, because the smaller ones were more readily marketable. Likewise, here, the existence of an actual market for large quantities of recyclable newspaper does not establish a general market for smaller quantities, because the evidence shows that the demand for smaller quantities is substantially less and, indeed, all but nonexistent.

Paul, with his willingness to pay value for minimal quantities of recyclable newspaper, is an exception in the recycling market in Portland. He is willing to buy small amounts not because of a business motivation, but because he has a personal willingness to do so for social policy reasons (*i.e.*, to promote conservation ethics). For present purposes, we are willing to assume that proof of a single, uniquely motivated buyer can satisfy the requirement to show the existence of a willing buyer in an arm's-length market transaction. But there still needs to be proof of a willing seller. Paul did not describe so much as one instance of a person collecting a nickel's worth of newspaper and bringing it to him, nor did the state ask if such transactions ever take place. Rather, as quoted earlier, the prosecutor asked only hypothetically what Paul would do if the prosecutor were to walk into Paul's business with the quantity of newspaper burned by youth, and Paul answered hypothetically that he would first try to get the prosecutor to donate it, but then would weigh it and pay the prosecutor a penny a pound.[14] That testimony did not

---

[14] In response to another question from the prosecutor, Paul also described that he regularly deals with charitable organizations that collect newspaper for fund-raising purposes. He did not describe any of them as considering it worthwhile to bring only a handful of newspapers to him. Indeed, Paul described such charitable organizations as making an effort to "collect" newspapers and then bringing them to Paul, suggesting that they collected more substantial quantities.

tend to establish that, in fact, willing sellers of such small quantities exist.

■■ The omission is significant. Where market value is concerned, it "takes two to make a bargain," and a willing seller as well as a willing buyer is required. *Highway Comm. v. Superbilt Mfg. Co.*, 204 Or 393, 420, 281 P2d 707 (1955). Necessarily, then, for an actual trade to occur, there must be sellers willing to sell on a willing buyer's terms. Here, the state needed to show the existence of someone willing to take the small quantity of newspaper involved, transport it whatever distance would be involved, and collect a nickel (or, in the case of a child, a quarter). The state did not do so. It would be purely speculative to infer the existence of someone willing to sell on the terms on which Paul was willing to buy. For that reason, the evidence did not establish the existence of a market for the small quantity of newspaper burned by youth in this case, and thus that the property burned had "market value." *See Taber*, 146 Or App at 740 (market value requires a market for an item).

The state's reliance on the value of the coupons in the newspapers suffers from the same shortcoming. As to the coupons, the only testimony presented by the state was that of the apartment manager, who merely stated that the newspaper contained coupons but did not discuss or describe them further. The state also placed into evidence some of the *This Week* newspapers that were in the laundry room and that were not destroyed in the fire. At trial, as on appeal, the state argued only that the coupons have value because consumers can save money purchasing the items for which the coupons can be redeemed. The trial court agreed, concluding that the coupons "have value to most families" and that such value, in addition to the recycling value, satisfied the statutory definition of property.

■ The problem with that approach is that it relies on the coupons' potential "use value" in the course of market transactions for other items.[15] That is not the same as the

That suggestion was reinforced by Paul's testimony that, at the time of trial, the price for recyclable newspaper had fallen below a penny a pound, which had the effect of discouraging charitable collection efforts.

[15] "Value in use," refers to the "utility of an object in satisfying, directly or indirectly, the needs or desires of human beings." *Black's Law Dictionary*, 1721 (4th ed

coupons having market value of their own, and it is not a kind of value that satisfies the statute. *See Whitley*, 295 Or at 459 ("symbolic value" or "value in use" does not satisfy statutory definition of property). Rather, the evidence had to establish a market for coupons in the sense that willing sellers exchange them for value from willing buyers in arm's-length transactions. The record simply is devoid of any such evidence.[16]

Because the state failed to present legally sufficient evidence of the newspaper's "value," the state failed to prove the "property" element of first-degree arson under ORS 164.325(1)(b). Because the state could not prove all of the elements of first-degree arson, the state could not prove felony murder. Consequently, the trial court erred in denying youth's motion to dismiss the charges of first-degree arson and felony murder.

Affirmed as to trial court's finding of jurisdiction based on an act that, if committed by an adult, would constitute crime of criminally negligent homicide; reversed as to trial court's finding of jurisdiction based on acts that, if committed by an adult, would constitute crimes of arson in the first degree and felony murder; remanded for entry of amended order of commitment.

---

1951). The same idea is now termed "use value": "A value established by the utility of an object instead of its value upon selling it or exchanging it." *Black's Law Dictionary*, 1550 (7th ed 1999).

The state's argument illustrates the distinction: "A coupon worth $1 off each gallon of milk may be worth nothing to someone who does not drink milk. But for a parent with young children who go through four gallons of milk a week, that same coupon would have a value of $4." That is use value—*i.e.*, the value of the utility of an object—not market value. The coupon has value because its use reduces the price of milk in a market transaction in which the object of the trade is milk, not the coupon.

[16] We note in that regard that we have examined the exhibit consisting of the charred newspapers found in the laundry room. Most of the coupons lack any notation of cash redemption value. The state did not—and does not now—rely on the fact that a few of the coupons have a declared cash redemption value of a fraction (1/20th) of one cent. At least arguably, their cash redemption value establishes that a merchant is willing to pay a fractional amount for some of the coupon themselves. Again, however, the record contains no evidence of a willing seller. That is, the evidence fails to establish that anyone considered the coupons in the *This Week* newspapers to be valuable enough to take the time and go to th effort to clip them, compile them, and redeem them for a *de minimis* amount. Again, it "takes two to make a bargain." *Superbilt Mfg. Co.*, 204 Or at 420. There is no evidence of the existence of a willing seller of the coupons contained in these particular newspapers.