Argued and submitted September 17, 2009, reversed and remanded
January 27, petition for review denied July 8, 2010 (348 Or 523)

In the Matter of L. A. W.,
a Youth.

STATE ex rel JUVENILE DEPARTMENT
OF MARION COUNTY,
*Appellant,*

*v.*

L. A. W.,
*Respondent.*

Marion County Circuit Court
07J0981;
Petition Number 111307WAL1;
A138346

226 P3d 60

David B. Thompson, Senior Assistant Attorney General, argued the cause for appellant. With him on the opening brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General. With him on the reply brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Christa Obold-Eshleman argued the cause and filed the brief for respondent.

Before Wollheim, Presiding Judge, and Sercombe, Judge, and Edmonds, Senior Judge.

EDMONDS, S. J.

## EDMONDS, S. J.

Youth is alleged to be within the juvenile court's jurisdiction as a result of acts that, if committed by an adult, would constitute unlawful sexual penetration in the first degree. ORS 419C.005(1). Specifically, youth is alleged to have unlawfully sexually penetrated a 10-year-old girl. Youth filed a pretrial motion to suppress his statements to a police detective on the ground that he had not voluntarily and knowingly waived his constitutional rights against self-incrimination. After hearing testimony and arguments from counsel, the juvenile court ruled that youth's statements were made voluntarily, but that youth's waiver of his rights was not knowing and intelligent. The state appeals that ruling pursuant to ORS 419A.208(1)(c). For the reasons that follow, we reverse.

We find the following facts on *de novo* review. ORS 419A.200(6)(b) (2007), *amended by* Or Laws 2009, ch 231, § 6.[1] At the time of the interview between youth and the police detective, youth was a 12-year-old middle school student. On the day in question, the detective and a caseworker with the Department of Human Services Child Welfare Program contacted the complaining witness and took a statement from her. They then went to youth's school where youth was brought to a room used by the school for counseling. The room, which had glass windows and shades on the windows, was next to the attendance room in the school office. The detective, dressed in business attire; the caseworker; and youth were all seated around a desk in the room. Before questioning youth, the detective read youth his *Miranda* rights from a prepared card. The detective read youth each right, one at a time. The detective then asked youth if he understood his rights or had any questions about them. Youth indicated that he did not have any questions about his rights.[2]

---

[1] The amendment to ORS 419A.200(6)(b) applies to appeals in which the notice of appeal was filed on or after June 4, 2009. Because the notice of appeal in this case was filed before that date, the amendment does not apply.

[2] The back of the card that youth signed states: "DO YOU UNDERSTAND THESE RIGHTS? DO YOU HAVE ANY QUESTIONS ABOUT YOUR RIGHTS?" After the first question, the word "Yeah" in quotes is printed by hand. After the second question, the word "No" in quotes is printed by hand. The detective wrote the quoted words on the card. At the bottom of the back of the card are what appear to be the signatures of youth and the detective.

When asked if he understood what the detective had read to him, youth replied, "Yeah." The detective then showed youth the card from which the detective had read, turned the card over, and said to youth, "Here they are." He then asked youth to sign an acknowledgement on the card that youth understood his rights and that he had no questions about them. Youth signed the card without asking any further questions. The caseworker testified without contradiction that youth's demeanor throughout the interview was calm and that he did not manifest any indicia of confusion or that he was emotionally upset.

After signing the card, the detective questioned youth about the complaining witness's report. Initially, youth denied the allegations, claiming that the complaining witness was "crazy." The detective persisted, however, explaining to youth that

> "[10]-year-old girls don't come up with these ideas off the top of their head, and that if it was a matter of, you know, [youth] making a mistake[,] and, you know, being sorry, you know, for some of his actions, I'd be willing to put that in my report."

Youth then acknowledged that he had sexually penetrated the complaining witness, although he maintained that she had invited his actions by telling him that she would no longer play videogames with him unless he acquiesced. Youth also spontaneously demonstrated how far his finger had penetrated the complaining witness's vagina. After the completion of the interview, which lasted 30 to 35 minutes, youth was placed in custody. As he was removed from the office, youth appeared to have a fainting spell. However, when rebuked by the officer, youth stood and accompanied the detective to his vehicle.

A caseworker was in the room while the detective interviewed youth. The caseworker was seated next to youth in the counseling room, separated by an empty chair. She verified that the detective had read the *Miranda* warnings to youth:

> "The main thing I remember in the beginning was that [youth] did have his *Miranda* rights read to him. He was told why we were there. And I recall at first him saying, no,

it didn't—he must have actually—yeah, [the detective] gave a little summary of why we were there and what the call was, and at first [youth], you know, said, no, that did not happen."

Youth maintained a flat affect throughout the interview, and the caseworker was surprised that youth did not cry. According to the caseworker, the detective did not directly call youth a liar but did tell him that, based on what the complaining witness had reported, the detective did not believe youth. At that point, youth began to volunteer information including a description of how and where the sexual contact occurred. The caseworker stated that the overall tenor of the interview had not been intimidating. She observed that the detective had not raised his voice during the interview.

In the month preceding the hearing, a psychologist whose practice involves adolescent sex offenders conducted a psychological evaluation of youth. He described youth as a 12-year-old with an intelligence quotient (IQ) of 106, which he characterized as "just about right on average for somebody of his chronological age" and a "mental age * * * roughly equivalent to his chronological age." As to youth's ability to understand the nature of the *Miranda* warnings that he was given, the psychologist testified that youth has "serious emotional problems" and

"he's got this profile, which puts him at some risk [to become a sex offender]. What effect that has on would he sign—did he know what he was doing when he signed the *Miranda* rights? I really have no idea. I don't put much confidence in that kind of information for a child, a child of unknown emotional problems. I just don't. It's not just a matter of [youth]; it's just as a general rule[,] I don't."

When asked directly about whether youth understood the *Miranda* warnings given to him, the psychologist responded, "Not necessarily."

■ After the hearing, the juvenile court made written findings and conclusions of law:

"The State presented sufficient evidence regarding lack of coercive tactics during the interview such to conclude that the Youth's waiver of *Miranda* Rights was voluntary. Included but not limited to the Court's finding was the fact

that the Youth was retrieved from class by school personnel; that he was questioned in an office by a plain clothed detective. The evidence showed that the officer used an even tone of inquiry, the timing of the interview was approximately thirty minutes; the uniformed officer that was present was the school resource officer and that his presence was expected and thus not inherently coercive. The Court also found that there were no threats or other implied promises made by the Detective to the Youth. After a thorough analysis[,] the Court found the interview to be lacking in coercive measure and the Youth's statements to be voluntary.

"* * * * *

"The Court found that the State did not present facts sufficient to establish that this Youth * * * understood his *Miranda* rights as presented, and thus did not make a knowing and intelligent waiver of [those rights] as defined in current case law. The Court, in making its decision cited such cases as [*State ex rel Juv. Dept. v. Deford*, 177 Or App 555, 34 P3d 673 (2001), and *State ex rel Juv. Dept. v. Cecil*, 177 Or App 583, 34 P3d 742 (2001)]. The Court considered the Youth's age, his lack of prior involvement with law enforcement, the issues presented in the Youth's psychological evaluation; the specific questioning of the Youth by [the detective,] and the testimony by [the psychologist] regarding his opinion as to whether or not Youth understood the *Miranda* rights as explained by the Detective. The Court found that [the detective] merely read to the Youth the rights in the *Miranda* warnings in their totality. There were no pauses, no explanations as to the Youth's individual rights, nor an inquiry of the Youth to demonstrate whether or not the Youth understood his rights. The State, having the burden, presented no evidence to support whether the Youth actually understood what the rights meant, (nothing other than the Youth himself had watched a TV program with other officers reading other adult defendants their rights). This observation in and of itself did not demonstrate the Youth's knowledge to what was being presented to him for signature.

"The evidence further showed that the Detective even indicated via an 'x' where the Youth should sign the card. There was no evidence, other than the Youth's signature, placed as directed by the Detective, presented by the State

for the Court to find that the Youth, under the totality of the circumstances[,] made a knowing and intelligent waiver.

"[The psychologist], on the other hand, did testify that said Youth, based on his specific circumstances did not understand the rights afforded to him by law as explained by the Detective. [The psychologist] further testified that most youth[s] do not have the capacity to knowingly and intelligently waive their Miranda rights. The near-absolutist stance presented by [the psychologist] was not persuasive to the Court. Nonetheless, the Court found that due to this Youth's specific circumstances, including but not limited to [the psychologist's] testimony, that this Youth did not understand what was presented to him."

Our standards of review in this case are two-fold. As noted above, our review of the facts is *de novo*. *See State ex rel Juv. Dept. v. Gallegos*, 150 Or App 344, 347, 945 P2d 656 (1997). Based on our factual findings, we must determine whether, as a matter of law, youth made a knowing and intelligent waiver of his *Miranda* rights. *Deford*, 177 Or App at 563.

■ Based on the record before us, we agree with the trial court's ruling that youth's statements to the police were voluntary in the sense that they were not coerced by the detective in any manner. At the time that youth made the incriminating statements to the detective, he was 12 years old with an IQ of 106, and he suffered from serious emotional problems. His mental age was roughly equivalent to his chronological age. Youth was a student in a middle school, and his educational experience was commensurate with his age. Moreover, there is no evidence in the record that his mental ability to understand oral or written information was impaired at the time of the contact with the detective. Rather, the only evidence on that issue is that youth stated "yeah" when asked if he understood his rights and that he complied when asked to acknowledge in writing that his rights had been read to him.

In addition to the above-described testimony of the detective and the caseworker, which was internally consistent, we have also considered the testimony of the psychologist. Like the trial court, we are unpersuaded by the psychologist's viewpoint that 12-year-olds in general do not have

capacity to understand *Miranda* warnings. The trial court, however, apparently inferred from the psychologist's testimony that youth was unable to comprehend his *Miranda* rights as administered by the detective. Our review of the evidentiary record, however, does not reveal support for that finding. It is true that the psychologist opined that youth had serious emotional problems. However, the psychologist did not explain how those problems would have interfered with youth's ability to understand the detective's statements. Indeed, the psychologist was asked what kind of effect youth's emotional problems would have on his ability to comprehend the warnings. The psychologist answered, in part,

> "I really have no idea. I don't put much confidence in that kind of information for a child, a child of unknown emotional problems. I just don't. It's not just a matter of [youth]; it's just a general rule[.]"

Additionally, the psychologist testified that youth's acknowledgment that youth understood his rights did not necessarily indicate that youth, in fact, understood them. When asked to explain his answer, the psychologist responded, "Because he's 12 years old. He has serious emotional problems. I don't—you know, he's not an adult." The psychologist also testified that youth "tends to be very people pleasing, if you will, for his own purposes, for manipulations, but he tends to be sociable in individual interview, wanting to please, talkative, so forth."

Based on those facts, we turn to whether youth knowingly and intelligently waived his *Miranda* rights. To conclude that youth's waiver of his rights was "knowing and intelligent," we must determine that, under the totality of the circumstances, youth knew that he could choose not to speak with the detective, to speak only with counsel present, and to discontinue talking at any time. Consequently, the inquiry focuses on youth's state of mind rather than on the detective's conduct. Overreaching by a law enforcement officer is not necessary for us to find that the waiver was not "knowing and intelligent." *Deford*, 177 Or App at 573. Among the factors to be considered in determining whether youth made a knowing and intelligent waiver are youth's age, physical condition,

experiences, level of education, background, and intelligence. *Id.*

Although fact-matching with other cases is generally not productive in determining whether a knowing and intelligent waiver occurred in a particular case, we pause to observe that we considered issues similar to the issue in this case in *Cecil* and *Deford* and that the juvenile court's analysis in this case relied, in part, on its understanding of our decisions in those cases.

In *Deford*, the youth, who was 11 years old at the time of his confession, offered medical evidence that he had the cognitive capacity of a seven-year-old child, lacked the ability to engage in abstract thought and reasoning, had difficulty in reading, and had an IQ that hovered in the borderline functioning or mildly mentally retarded range. One of the youth's experts testified that the youth could recognize "aspects of meaning or some parts" of the *Miranda* warnings but that he would have difficulty in drawing inferences or implications from the warnings. Another expert testified that the youth had a verbal capacity that made it appear that he understood when, in fact, he did not. In his view, the youth lacked an appreciation of the adversarial nature of the interviews with the police and the potential for self-incrimination arising therefrom. In sum, the witness believed that the youth did not understand that he could have an attorney present at the time of the interviews. *Deford*, 177 Or App at 561-62.

To rebut the youth's evidence, the state presented both the testimony of the police officers and an expert witness, who testified as to the youth's cognitive ability. We concluded, under the circumstances that we found to exist in that case, that the youth's confession was voluntary. *Id.* at 572. We then turned to whether the youth made a knowing and intelligent waiver and held that, under the circumstances of that case, he had. In particular, we observed that the officer conducting the interview read the warnings to the youth slowly and carefully and asked the youth to define them. The youth was able to repeat each warning and to give appropriate definitions. The youth also testified that when the officer read his rights to him, " 'I kind of figured out that

I was going to get arrested. The cops don't read you your rights for no reasons.' " *Id.* at 573. The youth also had prior contacts with the police in which he had been given his *Miranda* warnings. Finally, we observed that the "youth had the cognitive capacity to understand the warnings[.]" *Id.* at 574.

In *Cecil*, the 12-year-old youth testified that he did not understand that he could choose not to talk with the detective who, after giving the youth his *Miranda* warnings, interviewed him and elicited incriminating statements from him. On cross-examination, the youth testified, however, that he understood what the detective had told him. In support of the youth's argument, his psychologist testified that the youth typically did not offer any resistance to questioning and that she doubted that he had the capacity to assert his rights based on his IQ of 73, which is considered low-average and slightly above a mentally deficient level. The psychologist also stated that the youth had a learning disability and "a very poor" ability to comprehend and interpret what he heard. 177 Or App at 586. Referring to our analysis in *Deford*, we considered the youth's age, experience, education, background, and intelligence and concluded that he had validly waived his *Miranda* rights. *Id.* at 588.

It appears that the juvenile court's decision in this case was influenced by the fact that some of the circumstances in *Deford* were not demonstrated to exist in this case. However, the methodology used to advise the youth of his *Miranda* rights by the officer in *Deford* is not a litmus test to be used in every case for determining whether a waiver is made knowingly and intelligently. Rather, a determination of whether there was a valid waiver must be based on the totality of the circumstances that exist in a particular case. Those include, as discussed in *Deford* and *Cecil*, the youth's age, education, background, experience, and intelligence. Here, it appears from the evidence presented before the juvenile court that youth understood the warnings that he was furnished in light of his oral and written acknowledgement of them. Unlike the youths in *Cecil* and *Deford*, youth was of average intelligence and the testing administered by the psychologist did not indicate that youth had any learning disabilities. Youth's education level and mental age were both

commensurate with his chronological age. In fact, taken together, youth's age, intelligence, education, and demonstrated cognitive ability to track with and respond to the detective's questions constitute evidence that he had the competency to understand the warnings and the consequences of waiving them. The psychologist's testimony does not undermine that conclusion. At most, the psychologist, by his own admission, offered only an opinion about 12-year-olds as a general proposition, without any particularized explanation as to why youth, in light of his particular circumstances and abilities, could not appreciate the nature of the warnings. Based on all the facts of this case, we conclude that youth made a knowing and intelligent waiver of his constitutional rights not to incriminate himself.

Reversed and remanded.